UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CIVIL DIVISION

DEVIN FILIPPELLI as
Personal Representative of the
ESTATE OF KRYSTAL TALAVERA,                CASE NO.: 9:22-cv-81731
on behalf of the Estate and her Survivors,

              Plaintiff,

v.

GROW, LLC (d/b/a KD INCORPORATED
and THE KRATOM DISTRO); and SEAN
MICHAEL HARDER, individually.

_____Defendants._____/

## PLAINTIFF'S MOTION TO COMPEL U.S. CUSTOMS AND BORDER PROTECTION TO PRODUCE SUBPOENA DOCUMENTS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 45

COMES NOW, Plaintiff, DEVIN FILIPPELLI, as Personal Representative of the Estate of KRYSTAL TALAVERA, on behalf of the Estate and her Survivors, and files this motion to compel U.S. Customs and Border Protection ("CBP") to produce certain documents as outlined in Plaintiff's subpoena duces tecum dated March 10, 2023. As grounds for such request, Plaintiff states as follows:

## EVIDENCE RELIED UPON

**Exhibit A:** Section 14 of the Hague Convention

**Exhibit B:** Autopsy excerpt

**Exhibit C:** Discovery Requests and Responses

**Exhibit D:** Plaintiff's subpoena to U.S. Customs and Border Protection ("CBP")

**Exhibit E:** CBP's Objection to Plaintiff's subpoena

**Exhibit F:** Plaintiff's response to CBP

**Exhibit G:** Affidavit of Tamara Williams

## I. FACTS

Kratom is a botanical ingredient that makes its way into the U.S. from Indonesia, Malaysia, Thailand, and Papua New Guinea. R. Termini & V. Sannuti, *A Look Back at the DSHEA - over 25 Years Later: The Dangers of a Reactionary Approach to Dietary Supplement Regulation*, 22 Quinnipiac Health L.J. 171, 200 (2019). The kratom exporters in these countries are generally not subject to jurisdiction or judgment in the United States; none of the kratom producing countries have agreed to the Hague Convention on Service of Process. See *Gould v. P.T. Krakatau Steel*, 957 F.2d 573, 576–77 (8th Cir. 1992) (dismissing Indonesian manufacturer for lack of minimum contacts); Section 14 of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters – County Status Table (attached as Exhibit A). Kratom that is successfully brought across the United States border is marketed to consumers as a safe and all-natural dietary supplement. (See ECF 5).

Defendants, GROW and HARDER, worked with importers, manufacturers, suppliers, and distributors to obtain kratom products that were sold to consumers, including Krystal. *Id*.

Krystal died at the tender age of thirty-nine (39). (See Autopsy excerpt, attached as Exhibit B). She died as a result of acute mitragynine intoxication caused by kratom products that were sold by Defendants, GROW, LLC (d/b/a KD INCORPORATED and THE KRATOM DISTRO) (hereinafter "GROW") and SEAN MICHAEL HARDER (hereinafter "HARDER") (collectively referred to as Defendants). (See ECF 5 and Exhibit B).

Plaintiff filed suit against GROW and HARDER on November 4, 2022. (See ECF 1). As a defense, Defendants alleged that, "the negligence of another, not of this Defendant, caused or contributed to the loss alleged; and that such negligence of another was the sole proximate cause, superseding or independent intervening cause of the loss alleged." (See ECF 16 and 17).

Since that time, Plaintiff has diligently pursued information on the identities of these other non-defendants, including upstream manufacturers and suppliers who share responsibility for the dangerous kratom product that led to Ms. Talavera's death, so that they may be timely added as defendants. (See ECF 20; 23; and 28). At the onset, Plaintiff's counsel spoke with Defense counsel and inquired about the identity of upstream suppliers. (See ECF 28, Exhibit A). It immediately became clear that Defendants were not willing to

provide this information voluntarily. *Id.* Defendants' failures and refusals to provide this critical information continued through initial disclosures and also through responses to Plaintiff's discovery requests, which sought the "person(s) responsible for the manufacture, sale, and/or distribution of kratom…between January 1, 2016 and January 1, 2022" and "all importers, suppliers, manufacturers, distributors, or other sources who supplied kratom to [Defendants] between January 1, 2016 and January 1, 2022." (See Discovery Requests and Responses, attached as Exhibit C). Defendants, HARDER and GROW, supplied nothing more than Fifth Amendment objections coupled with claims that Defendant GROW does not have responsive information. *Id.*

Ultimately, when facing the Court's ruling on a motion to compel, HARDER and GROW announced their plan to withdraw their answers and affirmative defenses, and consent to default judgment – a plan that has effectively terminated Plaintiff's efforts to discover upstream kratom suppliers from HARDER and GROW. (See ECF 36 - 39).

In addition to discovery from HARDER and GROW, Plaintiff has been pursuing information through a third-party subpoena to U.S. Customs and Border Protection ("CBP"), pursuant to Federal Rule of Civil Procedure 45, requesting copies of kratom importation documents filed by Defendants. (See Plaintiff's subpoena to CBP attached as Exhibit D). On March 22, 2023, CBP objected to Plaintiff's subpoena, stating that Plaintiff's request was not in

compliance with 19 C.F.R. Part 103, Subpart B. (See CBP Objection attached as Exhibit E).

On March 23, 2023, Plaintiff responded to CBP's objection, and provided the agency with additional documents in compliance with 19 C.F.R. Part 103, Subpart B. (See Plaintiff's response to CBP, attached as Exhibit F). On April 3, 2023, Plaintiff's counsel conferred with a CBP representative regarding the subpoena. (See Affidavit of Tamara Williams, attached as Exhibit G). CBP advised that they are not inclined to comply with the subpoena unless and until the Court orders the agency to produce such documentation. *Id*.

Plaintiff now brings this motion to compel, requesting that an order be entered compelling CBP to produce responsive documents as outlined in Plaintiff's March 10, 2023 subpoena duces tecum.

## II.   <u>LEGAL STANDARD</u>

Rule 45 of the Federal Rules of Civil Procedure governs the process of issuing subpoenas. Fed. R.Civ.P. 45. A proper Rule 45 subpoena can command a non-party to attend and testify for depositions and to produce requested documents. Fed. R.Civ.P. 45(a)(1)(A). A subpoenaed non-party may object to the command, after which the serving party may move to compel compliance with the subpoena. Fed.R.Civ.P. 45(c)(2)(B). The Court may order compliance with the subpoena if the party serving the subpoena shows it has a substantial

need for the information that it otherwise cannot obtain without undue hardship. Fed.R.Civ.P. 45(c)(3)(C).

In ruling on discovery requests, Rule 45 must be read in conjunction with Federal Rule of Civil Procedure 26, since the latter rule "clearly defines the scope of discovery for all discovery devices." *Madeline L.L.C. v. Street*, 2009 WL 1563526 *1 (S.D.Fla.2008). Thus, a party may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the important issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden of expense of the proposed discovery outweighs its likely benefit. Fed.R.Civ.P. 26(b)(1). Information within this scope of discovery need not be admissible in evidence to be discoverable. *Id*.

## III.   **DISCUSSION**

Plaintiff seeks relevant and essential information from CBP regarding "other" upstream parties and affiliates responsible for the kratom that was consumed by Ms. Talavera before her death. CBP is tasked with protecting and facilitating international trade into the United States and works closely with importers to ensure compliance with importing laws and regulations.[1]

---

[1]   See   https://www.cbp.gov/about   (last   accessed   April   17,   2023).   See   also https://www.cbp.gov/sites/default/files/documents/Importing%20into%20the%20U.S.pdf (last accessed April 17, 2023).

Before any imported good is granted clearance, each importer of record is required to file various documents that disclose critical information, including, but not limited to: a description of the imported goods, the identity of the seller and buyer of the goods, the name of the vessel that transported the goods into the U.S., and the amount of goods imported on each shipment. *Id*. Once these documents are completed and filed by importers, they are kept in the regular course of business by CBP. (See footnote 1).

The subpoena Plaintiff served on CBP requests certain importation documents that Defendants were obligated to file, related to the importation of kratom. *Id*. Plaintiff's request is narrow and focused, solely seeking importation documents filed by Defendant HARDER from July 1, 2018 to July 1, 2021 involving kratom. (See Exhibit D). The documents requested by Plaintiff will likely identify those manufacturers, distributors, suppliers, and importers responsible for Krystal's death.

CBP initially objected on the basis that Plaintiff had not complied with the requirements of 19 C.F.R. 103. (See Exhibit E). Subsequently, Plaintiff cured that defect, showing CBP how the requested documentation: is relevant and material to the pending action; necessary to the proceeding; not available from other sources; reasonable in scope; does not violate the Trade Secret Act; would not improperly reveal confidential commercial information; would not

relate to documents produced by another agency or entity; and shows that CBP has an interest in the matter. (See Exhibit F).

If the Court does not order CBP to produce the requested documents, there is a great risk that Plaintiff will never be able to recover from those responsible for the tragic death of Krystal Talavera.

## IV.    <u>CONCLUSION</u>

For the reasons stated above, Plaintiff respectfully asks this Court to enter an order compelling U.S. Customs and Border Protection to produce all documents identified in Plaintiff's subpoena duces tecum, dated March 10, 2023.

## <u>CERTIFICATE OF GOOD FAITH CONFERRAL</u>

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movant has conferred with opposing counsel via electronic mail in a good faith effort to resolve the issues addressed herein but has been unable to resolve the issues. Defense counsel objects to the filing of this motion.

Counsel for the movant has also conferred with non-party, U.S. Customs and Border Protection, who may be affected by the relief sought. On April 3, 2023, via telephone conference, CBP instructed Plaintiff's counsel to file the foregoing motion, and does not object to the filing of this motion.

Dated this 17th day of April 2023.



Tamara J. Williams, Esq.
Florida Bar No. 127625
Michael J. Cowgill, Esq.
Florida Bar No. 1010945
**mctlaw**
1605 Main Street, Suite 710
Sarasota, FL 34236
Telephone: 888.952.5242
Facsimile: 941.952.5042
Primary: twilliams@mctlaw.com
Primary: mcowgill@mctlaw.com
Secondary: hdiener@mctlaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I CERTIFY that on this 17th day of April 2023, a true electronic copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, and has been submitted to Defendants' counsel, Justin Niznik Esquire, Bowman and Brooke LLP, at justin.niznik@bowmanandbrooke.com; orfa.diaz@bowmanandbrooke.com; and kara.thomas@bowmanandbrooke.com.

Tamara J. Williams, Esq.
Florida Bar No. 127625
**mctlaw**
1605 Main Street, Suite 710
Sarasota, FL 34236
Telephone: 888.952.5242
Primary: twilliams@mctlaw.com
Secondary: hdiener@mctlaw.com

*Attorneys for Plaintiff*

# Text of Hague Service Convention and Signatories

1. **Information and purchasing instructions for the Practical Handbook on the Operation of the Hague Service Convention.**

    http://www.hcch.net/index_en.php?act=publications.details&pid=2728

2. **Table of countries that participate, with links to the information for each country's Central Authority and other practical information about service in that country.**

    http://www.hcch.net/index_en.php?act=conventions.statusprint&cid=17

3. **Table listing the applicability of certain Convention articles in each country.**

    http://www.hcch.net/upload/applicability14e.pdf

4. **PDF model form for request of service abroad.**

    Fillable: http://www.hcch.net/upload/act_form14e.pdf

    Printable: http://www.hcch.net/upload/form14e2.pdf

5. **Instructions for filling out the model form.**

    http://www.hcch.net/index_en.php?act=publications.details&pid=27&dtid=2

6. **More general info. (i.e. not limited to Hague Service Convention) from the U.S. State Department on service abroad.**

    http://www.travel.state.gov/law/judicial/judicial_680.html

(information above provided by Offices of the AOC)

**Exhibit A**                    1

**14. CONVENTION ON THE SERVICE ABROAD OF JUDICIAL AND EXTRAJUDICIAL DOCUMENTS IN CIVIL OR COMMERCIAL MATTERS**

*(Concluded 15 November 1965)*

The States signatory to the present Convention,

Desiring to create appropriate means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time,

Desiring to improve the organisation of mutual judicial assistance for that purpose by simplifying and expediting the procedure,

Have resolved to conclude a Convention to this effect and have agreed upon the following provisions:

Article 1

The present Convention shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad.

This Convention shall not apply where the address of the person to be served with the document is not known.

CHAPTER I – JUDICIAL DOCUMENTS

Article 2

Each Contracting State shall designate a Central Authority which will undertake to receive requests for service coming from other Contracting States and to proceed in conformity with the provisions of Articles 3 to 6.

Each State shall organise the Central Authority in conformity with its own law.

Article 3

The authority or judicial officer competent under the law of the State in which the documents originate shall forward to the Central Authority of the State addressed a request conforming to the model annexed to the present Convention, without any requirement of legalisation or other equivalent formality.

The document to be served or a copy thereof shall be annexed to the request. The request and the document shall both be furnished in duplicate.

Article 4

If the Central Authority considers that the request does not comply with the provisions of the present Convention it shall promptly inform the applicant and specify its objections to the request.

Article 5

The Central Authority of the State addressed shall itself serve the document or shall arrange to have it served by an appropriate agency, either –

*a)* by a method prescribed by its internal law for the service of documents in domestic actions upon persons who are within its territory, or

*b)* by a particular method requested by the applicant, unless such a method is incompatible with the law of the State addressed.

Subject to sub-paragraph *(b)* of the first paragraph of this Article, the document may always be served by delivery to an addressee who accepts it voluntarily.

If the document is to be served under the first paragraph above, the Central Authority may require the document to be written in, or translated into, the official language or one of the official languages of the State addressed.

That part of the request, in the form attached to the present Convention, which contains a summary of the document to be served, shall be served with the document.

Article 6

The Central Authority of the State addressed or any authority which it may have designated for that purpose, shall complete a certificate in the form of the model annexed to the present Convention.

The certificate shall state that the document has been served and shall include the method, the place and the date of service and the person to whom the document was delivered. If the document has not been served, the certificate shall set out the reasons which have prevented service.

The applicant may require that a certificate not completed by a Central Authority or by a judicial authority shall be countersigned by one of these authorities.

The certificate shall be forwarded directly to the applicant.

2

Article 7

The standard terms in the model annexed to the present Convention shall in all cases be written either in French or in English. They may also be written in the official language, or in one of the official languages, of the State in which the documents originate.

The corresponding blanks shall be completed either in the language of the State addressed or in French or in English.

Article 8

Each Contracting State shall be free to effect service of judicial documents upon persons abroad, without application of any compulsion, directly through its diplomatic or consular agents.

Any State may declare that it is opposed to such service within its territory, unless the document is to be served upon a national of the State in which the documents originate.

Article 9

Each Contracting State shall be free, in addition, to use consular channels to forward documents, for the purpose of service, to those authorities of another Contracting State which are designated by the latter for this purpose.

Each Contracting State may, if exceptional circumstances so require, use diplomatic channels for the same purpose.

Article 10

Provided the State of destination does not object, the present Convention shall not interfere with –

a) the freedom to send judicial documents, by postal channels, directly to persons abroad,

b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,

c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

Article 11

The present Convention shall not prevent two or more Contracting States from agreeing to permit, for the purpose of service of judicial documents, channels of transmission other than those provided for in the preceding Articles and, in particular, direct communication between their respective authorities.

Article 12

The service of judicial documents coming from a Contracting State shall not give rise to any payment or reimbursement of taxes or costs for the services rendered by the State addressed.

The applicant shall pay or reimburse the costs occasioned by –-

a) the employment of a judicial officer or of a person competent under the law of the State of destination,

b) the use of a particular method of service.

Article 13

Where a request for service complies with the terms of the present Convention, the State addressed may refuse to comply therewith only if it deems that compliance would infringe its sovereignty or security.

It may not refuse to comply solely on the ground that, under its internal law, it claims exclusive jurisdiction over the subject-matter of the action or that its internal law would not permit the action upon which the application is based.

The Central Authority shall, in case of refusal, promptly inform the applicant and state the reasons for the refusal.

Article 14

Difficulties which may arise in connection with the transmission of judicial documents for service shall be settled through diplomatic channels.

Article 15

Where a writ of summons or an equivalent document had to be transmitted abroad for the purpose of service, under the provisions of the present Convention, and the defendant has not appeared, judgment shall not be given until it is established that –

3

*a)* the document was served by a method prescribed by the internal law of the State addressed for the service of documents in domestic actions upon persons who are within its territory, or

*b)* the document was actually delivered to the defendant or to his residence by another method provided for by this Convention,

and that in either of these cases the service or the delivery was effected in sufficient time to enable the defendant to defend.

Each Contracting State shall be free to declare that the judge, notwithstanding the provisions of the first paragraph of this Article, may give judgment even if no certificate of service or delivery has been received, if all the following conditions are fulfilled –

*a)* the document was transmitted by one of the methods provided for in this Convention,

*b)* a period of time of not less than six months, considered adequate by the judge in the particular case, has elapsed since the date of the transmission of the document,

*c)* no certificate of any kind has been received, even though every reasonable effort has been made to obtain it through the competent authorities of the State addressed.

Notwithstanding the provisions of the preceding paragraphs the judge may order, in case of urgency, any provisional or protective measures.

Article 16

When a writ of summons or an equivalent document had to be transmitted abroad for the purpose of service, under the provisions of the present Convention, and a judgment has been entered against a defendant who has not appeared, the judge shall have the power to relieve the defendant from the effects of the expiration of the time for appeal from the judgment if the following conditions are fulfilled –

*a)* the defendant, without any fault on his part, did not have knowledge of the document in sufficient time to defend, or knowledge of the judgment in sufficient time to appeal, and

*b)* the defendant has disclosed a *prima facie* defence to the action on the merits.

An application for relief may be filed only within a reasonable time after the defendant has knowledge of the judgment.

Each Contracting State may declare that the application will not be entertained if it is filed after the expiration of a time to be stated in the declaration, but which shall in no case be less than one year following the date of the judgment.

This Article shall not apply to judgments concerning status or capacity of persons.

CHAPTER II – EXTRAJUDICIAL DOCUMENTS

Article 17

Extrajudicial documents emanating from authorities and judicial officers of a Contracting State may be transmitted for the purpose of service in another Contracting State by the methods and under the provisions of the present Convention.

CHAPTER III – GENERAL CLAUSES

Article 18

Each Contracting State may designate other authorities in addition to the Central Authority and shall determine the extent of their competence.

The applicant shall, however, in all cases, have the right to address a request directly to the Central Authority.

Federal States shall be free to designate more than one Central Authority.

Article 19

To the extent that the internal law of a Contracting State permits methods of transmission, other than those provided for in the preceding Articles, of documents coming from abroad, for service within its territory, the present Convention shall not affect such provisions.

Article 20

The present Convention shall not prevent an agreement between any two or more Contracting States to dispense with –

*a)* the necessity for duplicate copies of transmitted documents as required by the second paragraph of Article 3,

*b)* the language requirements of the third paragraph of Article 5 and Article 7,

*c)* the provisions of the fourth paragraph of Article 5,

*d)* the provisions of the second paragraph of Article 12.

Article 21

Each contracting State shall, at the time of the deposit of its instrument of ratification or accession, or at a later date, inform the Ministry of Foreign Affairs of the Netherlands of the following –

a) the designation of authorities, pursuant to Articles 2 and 18,

b) the designation of the authority competent to complete the certificate pursuant to Article 6,

c) the designation of the authority competent to receive documents transmitted by consular channels, pursuant to Article 9.

Each Contracting State shall similarly inform the Ministry, where appropriate, of –

a) opposition to the use of methods of transmission pursuant to Articles 8 and 10,

b) declarations pursuant to the second paragraph of Article 15 and the third paragraph of Article 16,

c) all modifications of the above designations, oppositions and declarations.

### Article 22

Where Parties to the present Convention are also Parties to one or both of the Conventions on civil procedure signed at The Hague on 17th July 1905, and on 1st March 1954, this Convention shall replace as between them Articles 1 to 7 of the earlier Conventions.

### Article 23

The present Convention shall not affect the application of Article 23 of the Convention on civil procedure signed at The Hague on 17th July 1905, or of Article 24 of the Convention on civil procedure signed at The Hague on 1st March 1954.

These Articles shall, however, apply only if methods of communication, identical to those provided for in these Conventions, are used.

### Article 24

Supplementary agreements between Parties to the Conventions of 1905 and 1954 shall be considered as equally applicable to the present Convention, unless the Parties have otherwise agreed.

### Article 25

Without prejudice to the provisions of Articles 22 and 24, the present Convention shall not derogate from Conventions containing provisions on the matters governed by this Convention to which the Contracting States are, or shall become, Parties.

### Article 26

The present Convention shall be open for signature by the States represented at the Tenth Session of the Hague Conference on Private International Law.

It shall be ratified, and the instruments of ratification shall be deposited with the Ministry of Foreign Affairs of the Netherlands.

### Article 27

The present Convention shall enter into force on the sixtieth day after the deposit of the third instrument of ratification referred to in the second paragraph of Article 26.

The Convention shall enter into force for each signatory State which ratifies subsequently on the sixtieth day after the deposit of its instrument of ratification.

### Article 28

Any State not represented at the Tenth Session of the Hague Conference on Private International Law may accede to the present Convention after it has entered into force in accordance with the first paragraph of Article 27. The instrument of accession shall be deposited with the Ministry of Foreign Affairs of the Netherlands.

The Convention shall enter into force for such a State in the absence of any objection from a State, which has ratified the Convention before such deposit, notified to the Ministry of Foreign Affairs of the Netherlands within a period of six months after the date on which the said Ministry has notified it of such accession.

In the absence of any such objection, the Convention shall enter into force for the acceding State on the first day of the month following the expiration of the last of the periods referred to in the preceding paragraph.

### Article 29

Any State may, at the time of signature, ratification or accession, declare that the present Convention shall extend to all the territories for the international relations of which it is

responsible, or to one or more of them. Such a declaration shall take effect on the date of entry into force of the Convention for the State concerned.

At any time thereafter, such extensions shall be notified to the Ministry of Foreign Affairs of the Netherlands.

The Convention shall enter into force for the territories mentioned in such an extension on the sixtieth day after the notification referred to in the preceding paragraph.

Article 30

The present Convention shall remain in force for five years from the date of its entry into force in accordance with the first paragraph of Article 27, even for States which have ratified it or acceded to it subsequently.

If there has been no denunciation, it shall be renewed tacitly every five years.

Any denunciation shall be notified to the Ministry of Foreign Affairs of the Netherlands at least six months before the end of the five year period.

It may be limited to certain of the territories to which the Convention applies.

The denunciation shall have effect only as regards the State which has notified it. The Convention shall remain in force for the other Contracting States.

Article 31

The Ministry of Foreign Affairs of the Netherlands shall give notice to the States referred to in Article 26, and to the States which have acceded in accordance with Article 28, of the following –

a) the signatures and ratifications referred to in Article 26;

b) the date on which the present Convention enters into force in accordance with the first paragraph of Article 27;

c) the accessions referred to in Article 28 and the dates on which they take effect;

d) the extensions referred to in Article 29 and the dates on which they take effect;

e) the designations, oppositions and declarations referred to in Article 21;

f) the denunciations referred to in the third paragraph of Article 30.

In witness whereof the undersigned, being duly authorised thereto, have signed the present Convention.

Done at The Hague, on the 15th day of November, 1965, in the English and French languages, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Government of the Netherlands, and of which a certified copy shall be sent, through the diplomatic channel, to each of the States represented at the Tenth Session of the Hague Conference on Private International Law.

6

# SIGNATORIES 14: Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters

Entry into force: 10-II-1969, Last update: 27-I-2011
Number of Contracting States to this Convention: 62

---

1) S = Signature
2) R/A/Su = Ratification, Accession or Succession
3) Type = R: Ratification;
A: Accession;
A*: Accession giving rise to an acceptance procedure; click on A* for details of acceptances of the accession;
C: Continuation;
Su: Succession;
Den: Denunciation;
4) EIF = Entry into force
5) Ext = Extensions of application
6) Auth = Designation of Authorities
7) Res/D/N = Reservations, declarations or notifications

**Members of the Organisation (click here for the non-Member States)**

| States | S[1] | R/A/Su [2] | Type [3] | EIF [4] | Ext [5] | Auth [6] | Res/D/N [7] |
|---|---|---|---|---|---|---|---|
| Albania | | 1-XI-2006 | A | 1-VII-2007 | | 3 | |
| Argentina | | 2-II-2001 | A | 1-XII-2001 | | 2 | D,Res5,10,15,16 |
| Australia | | 15-III-2010 | A | 1-XI-2010 | 7 | 5 | D5,8,9,10,15,16,17,29 |
| Belarus | | 6-VI-1997 | A | 1-II-1998 | | 1 | |
| Belgium | 21-I-1966 | 19-XI-1970 | R | 18-I-1971 | | 2 | D8,15,16 |
| Bosnia and Herzegovina | | 16-VI-2008 | A | 1-II-2009 | | 1 | |
| Bulgaria | | 23-XI-1999 | A | 1-VIII-2000 | | 3 | D5,8,10,15,16 |
| Canada | | 26-IX-1988 | A | 1-V-1989 | | 4 | D5,8,10,11,12,15,16,2 |
| China, People's Republic of | | 6-V-1991 | A | 1-I-1992 | | 8 | D,N5,8,10,15,16 |
| Croatia | | 28-II-2006 | A | 1-XI-2006 | | 3 | Res,D5,6,8,9,10,15,16 |
| Cyprus | | 26-X-1982 | A | 1-VI-1983 | | 4 | D8,10,15,16 |
| Czech Republic | | 28-I-1993 | Su | 1-I-1993 | | 4 | D,Res8,10,15,29 |
| Denmark | 7-I- | 2-VIII- | R | 1-X- | | 3 | D10,15,16 |

7

| | 1969 | 1969 | | 1969 | | | |
|---|---|---|---|---|---|---|---|
| Egypt | 1-III-1966 | 12-XII-1968 | R | 10-II-1969 | | 1 | Res8,10 |
| Estonia | | 2-II-1996 | A | 1-X-1996 | | 1 | D10,15,16 |
| Finland | 15-XI-1965 | 11-IX-1969 | R | 10-XI-1969 | | 2 | D2,9,10 |
| France | 12-I-1967 | 3-VII-1972 | R | 1-IX-1972 | 1 | 3 | D8,15,16 |
| Germany | 15-XI-1965 | 27-IV-1979 | R | 26-VI-1979 | | 3 | D5,8,10,15,16 |
| Greece | 20-VII-1983 | 20-VII-1983 | R | 18-IX-1983 | | 1 | D8,10,15 |
| Hungary | | 13-VII-2004 | A | 1-IV-2005 | | 3 | D2,5,6,8,9,10,15,16 |
| Iceland | | 10-XI-2008 | A | 1-VII-2009 | | 1 | D,Res10,15,16 |
| India | | 23-XI-2006 | A | 1-VIII-2007 | | 1 | D,Res10,15,16 |
| Ireland | 20-X-1989 | 5-IV-1994 | R | 4-VI-1994 | | 3 | D,Res10,15 |
| Israel | 25-XI-1965 | 14-VIII-1972 | R | 13-X-1972 | | 2 | D,Res10,16 |
| Italy | 25-I-1979 | 25-XI-1981 | R | 24-I-1982 | | 3 | D5,12 |
| Japan | 12-III-1970 | 28-V-1970 | R | 27-VII-1970 | | 3 | D10,15 |
| Korea, Republic of | | 13-I-2000 | A | 1-VIII-2000 | | 2 | D,Res8,10,15 |
| Latvia | | 28-III-1995 | A | 1-XI-1995 | | 4 | D5,8,10,15 |
| Lithuania | | 2-VIII-2000 | A | 1-VI-2001 | | 1 | D,Res8,10,15,16 |
| Luxembourg | 27-X-1971 | 9-VII-1975 | R | 7-IX-1975 | | 1 | D,Res5,8,15,16 |
| Mexico | | 2-XI-1999 | A | 1-VI-2000 | | 1 | D5,6,8,10,12,15,16 |
| Monaco | | 1-III-2007 | A | 1-XI-2007 | | 2 | D8,10,15,16 |
| Netherlands | 15-XI-1965 | 3-XI-1975 | R | 2-I-1976 | 1 | 5 | D15,16 |
| Norway | 15-X-1968 | 2-VIII-1969 | R | 1-X-1969 | | 3 | D,Res8,10,15,16 |
| Poland | | 13-II-1996 | A | 1-IX-1996 | | 4 | Res8,10 |
| Portugal | 5-VII-1971 | 27-XII-1973 | R | 25-II-1974 | | 2 | D8,15,16 |
| Romania | | 21-VIII-2003 | A | 1-IV-2004 | | 2 | D8,16 |
| Russian Federation | | 1-V-2001 | A | 1-XII-2001 | | 4 | D,Res2,3,5,6,8,9,10,12,15 |

| States | S | R/A/Su | Type | EIF | Ext | Auth | Res/D/N |
|---|---|---|---|---|---|---|---|
| Serbia | | 2-VII-2010 | A | 1-II-2011 | | 2 | D5,6,8,10,15,16 |
| Slovakia | | 15-III-1993 | Su | 1-I-1993 | | 4 | D8,10,15,29 |
| Slovenia | | 18-IX-2000 | A | 1-VI-2001 | | 1 | |
| Spain | 21-X-1976 | 4-VI-1987 | R | 3-VIII-1987 | | 3 | D15,16 |
| Sri Lanka | | 31-VIII-2000 | A | 1-VI-2001 | | 3 | D7,8,10,15 |
| Sweden | 4-II-1969 | 2-VIII-1969 | R | 1-X-1969 | | 2 | D5,10 |
| Switzerland | 21-V-1985 | 2-XI-1994 | R | 1-I-1995 | | 3 | D,Res1,5,8,10,15 |
| The former Yugoslav Republic of Macedonia | | 23-XII-2008 | A | 1-IX-2009 | | 1 | D,Res5,6,8,9,10,15,16,21 |
| Turkey | 11-VI-1968 | 28-II-1972 | R | 28-IV-1972 | | 3 | Res,D8,10,15,16 |
| Ukraine | | 1-II-2001 | A | 1-XII-2001 | | 3 | D,Res8,10,15,16 |
| United Kingdom of Great Britain and Northern Ireland | 10-XII-1965 | 17-XI-1967 | R | 10-II-1969 | 14 | 4 | D2,5,10,15,16,18 |
| United States of America | 15-XI-1965 | 24-VIII-1967 | R | 10-II-1969 | 1 | 1 | D2,15,16,29 |
| Venezuela | | 29-X-1993 | A | 1-VII-1994 | | 1 | D,Res5,8,10,1516 |

## Non-Member States of the Organisation ([click here for the Members](#))

| States | S[1] | R/A/Su[2] | Type[3] | EIF[4] | Ext[5] | Auth[6] | Res/D/N[7] |
|---|---|---|---|---|---|---|---|
| Antigua and Barbuda | | 1-V-1985 | Su | 1-XI-1981 | | 1 | |
| Bahamas | | 17-VI-1997 | A | 1-II-1998 | | 1 | |
| Barbados | | 10-II-1969 | A | 1-X-1969 | | 1 | |
| Belize | | 8-IX-2009 | A | 1-V-2010 | | | |
| Botswana | | 10-II-1969 | A | 1-IX-1969 | | 3 | D5,10,15 |
| Kuwait | | 8-V-2002 | A | 1-XII-2002 | | 3 | D,Res6,8,9,10,15,16,18 |
| Malawi | | 24-IV-1972 | A | 1-XII-1972 | | 1 | |
| Pakistan | | 7-XII-1988 | A | 1-VIII-1989 | | 3 | D8,15,16 |
| Saint Vincent and the Grenadines | | 6-I-2005 | Su | 27-X-1979 | | 3 | D5,10,15 |
| San Marino | | 15-IV-2002 | A | 1-XI-2002 | | 3 | D8,10,15 |
| Seychelles | | 18-XI-1980 | A | 1-VII-1981 | | 1 | D8,10,15,16 |



**OFFICE OF THE DISTRICT MEDICAL EXAMINER**
**DISTRICT 15 – STATE OF FLORIDA**
**PALM BEACH COUNTY**
**3126 GUN CLUB ROAD**
**WEST PALM BEACH, FLORIDA 33406-3005**
**(561) 688-4575**
**(561) 688-4592 FAX**

**NAME:**  TALAVERA, KRYSTAL                    **CASE NUMBER:**  M21-01109

**DATE OF DEATH:**  June 20, 2021          **AGE:** 39    **SEX:** F    **RACE:**  W

**DATE OF AUTOPSY:**  June 21, 2021 / 0833 hours

## MEDICAL EXAMINER REPORT

I.   Acute mitragynine intoxication, see separate toxicology record
   A.  Heavy brain, 1335 grams
   B.  Circumstances of death: History of Kratom use, per report
   C.  How injury occurred: Ingested supratherapeutic amount(s) of mitragynine (kratom)
II.   Hypertensive cardiovascular disease:  Nephrosclerosis
III.   Hepatomegaly, 2437 grams
IV.   Gastritis
V.   Duodenal polyp, benign
VI.   Status post organ/tissue procurement, see separate record(s)
VII.   Cardiac Pathology Report, see separate record: No significant histopathologic change
VIII.   Vitreous electrolyte panel, see separate record: Noncontributory

   Cause of Death:  Acute mitragynine intoxication

   Manner of Death:  Accident

Opinion: The decedent died from an acute mitragynine intoxication. At high concentrations, mitragynine produces opioid-like effects; such as, respiratory failure.  The manner of death is "Accident."

*Terrill L. Tops, MD*

Terrill Tops, M.D.
Associate Medical Examiner
Date Signed: 07/29/2021

**Exhibit B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CIVIL DIVISION

| | |
|---|---|
| **DEVIN FILIPPELLI, as Personal Representative of the ESTATE OF KRYSTAL TALAVERA, on behalf of the Estate and her Survivors,** )<br><br>            **Plaintiff,** )<br>**v.** )<br><br>**GROW, LLC (d/b/a KD INCORPORATED and THE KRATOM DISTRO); and SEAN MICHAEL HARDER, individually** )<br><br>            **Defendants.** )<br>_____ ) | **Civil Action No. 9:22-cv-81731** |

<u>**GROW LLC (D/B/A KD INCORPORATED and THE KRATOM DISTRO)'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S INTERROGATORIES AND REQUESTS FOR DOCUMENTS**</u>

Defendant, **GROW, LLC (d/b/a KD INCORPORATED** and **THE KRATOM DISTRO)** ("GROW"), by and through its undersigned counsel, and pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, hereby serves its Responses to Plaintiff's First Set of Interrogatories and First Request for Production served on January 27, 2023, as follows:

<u>**OBJECTIONS**</u>

1.      GROW objects to Plaintiff's Request for Production to the extent that its requests are vague, overly broad, and contain definitions contrary to ordinary and customary usage. GROW's responses assume common sense and common meaning.

2.      GROW objects to the extent that Plaintiffs' Request for Production seeks the production of attorney/client privileged communications, privileged work product or any other information or documents which are irrelevant, confidential, privileged or beyond the scope of

1
**Exhibit C**

information or documents reasonably calculated to lead to the discovery of admissible evidence. A privilege log will be provided, upon Plaintiffs' request, in accordance with Florida law for any documents subject to attorney-client and/or work product privilege.

3.    GROW also objects to the extent that Plaintiffs' Request for Production seeks to impose unreasonable, unduly burdensome, or overly broad obligations upon GROW.

4.    The assertion of the same, similar, or additional objections or the provisions of partial answers in response to individual interrogatories does not waive any of GROW's general objections set forth as follows:

5.    GROW objects to any interrogatories requiring an answer containing information or identification of documents protected by the attorney, client and/or work product privileges.

6.    GROW objects to any interrogatories requiring an answer or documents containing information or identification of documents not reasonably calculated to lead to the discovery of admissible evidence.

7.    GROW has not completed a review of all documents related to this action, investigated all facts related to this action, interviewed all witnesses in this action, completed discovery in this action, or completed preparation for trial.  Consequently, the answers to interrogatories set forth herein are based upon information known or believed by GROW at the time these responses were prepared.  As such, GROW reserves the right to amend its responses set forth herein as discovery proceeds in this matter.

8.    GROW specifically reserves the right to challenge the competency, relevancy, materiality, and admissibility of, or to object on any ground to the use of, information or identification of documents set forth herein in any subsequent proceeding, trial, or any other action.

## RESPONSES TO INTERROGATORIES

1.     Please describe the person(s) responsible for the manufacture, sale, and/or distribution of kratom from GROW in Meridian, Idaho between January 1, 2016 and January 1, 2022. In your response, please include the owners, officers, directors, managers, and/or affiliates overseeing GROW's operations relating to the acquisition, manufacture, packaging, marketing, and sale of GROW's kratom products to consumers.

**ANSWER:  GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

2.     Please describe the extent to which you believe GROW's kratom products are subject to the Federal Food, Drug, and Cosmetic Act (FDCA) and the Dietary Supplement Health and Education Act of 1994 (DSHEA).  Your description should specify any FDCA and/or DSHEA regulations GROW contends it has attempted to comply with, such as regulations governing premarket notifications, premarket analyses of safety and efficacy, development of manufacturing controls, labeling and branding requirements, and any exemptions from such regulations.  If you believe GROW's products are not subject to FDCA and/or DSHEA, please specify the factual basis for that belief including any industry guidance received to support that belief.

**ANSWER:     GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

3.     Please identify all importers, suppliers, manufacturers, distributors, or other sources who supplied kratom to GROW between January 1, 2016 and January 1, 2022. In your answer, please include the name, address, and phone number for all manufacturers; the forms and specific kratom product types provided; and whether the facility where manufacturing takes place has been registered under the FDCA.

**ANSWER: GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

4.     Please describe the extent to which each person identified in the previous interrogatory supplied you with information about their kratom, including but not limited to information regarding the quality, safety, content, potencies, purities, properties, uses, misuses, benefits, risks, warnings, labeling and/or marketing of the kratom supplied.  In your description specify the date(s) you received such information provided, the arrangements made, the form and content of the information, and the individuals involved in the exchange of information.

**<u>ANSWER</u>: GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

5.      Please describe the manufacturing processes followed with respect to the kratom products sold by GROW between January 1, 2016 and January 1, 2022. Your description should include the standards, procedures and practices applied for each of GROW's kratom product types, and the persons involved (whether GROW, a GROW affiliate, or an importer/manufacturer who is separate from GROW). The term "standards" refers to any regulatory or industry standards, such as standards and/or related certifications utilized by the FDCA, DSHEA, the supplement industry, the American Kratom Association (AKA), or other entities. In your response, please specify the nature and extent of any audits or evaluations of compliance with such processes.

**<u>ANSWER</u>: GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

6.      Please identify all employees and contractors who have been paid by GROW to assist in the production and sale of kratom products between January 1, 2016 and January 1, 2022. This includes employees and contractors involved in the ordering, manufacture, refining, packaging, marketing and distribution of those kratom products, as well as any other GROW's administrative and/or business operations. In your identification, please include the name and contact information for each employee and contractor, the dates of employment and/or contracts, and the nature of the employment and services paid for.

**<u>ANSWER</u>: GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

7.      Please describe the extent to which the kratom products sold by GROW between January 1, 2016 and January 1, 2022 were lab tested. In your description specify the person's responsible for testing GROW's kratom, and the type of testing utilized -- including but not limited to any testing for heavy metals, specific alkaloids, product purity, and/or product potency. Your response should include the extent to which each of your specific kratom product types (i.e., Space Dust, Green Maeng, Green Horned Maeng Da, Green Riau, etc.) were or were not all subject to the testing described.

**<u>ANSWER</u>: GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

4

8.      Please describe the differences in quality and content for GROW's kratom products offered for sale between January 1, 2016 and January 1, 2022. In your description include the full extent of your knowledge about GROW's kratom products' biological and psychoactive compounds (and potencies thereof), purity (including heavy metal content), strains, and variability in any of the foregoing. Your description should specify the bases for such knowledge, including all testing results, and testing processes.

**ANSWER:  GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

9.      Please describe the extent to which GROW has familiarized itself with the risks and dangers associated with the human consumption of GROW's kratom products. This would include GROW's efforts to identify and address risks from kratom, and the types of risks GROW believes its consumers would expect to be notified (for instance, what if anything has GROW done to ascertain the risks of overdose or death from kratom use?). In your description, please explain when and how you became aware of each particular risk of harm described in your response.

**ANSWER:  GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

10.     Please describe the nature and extent of your representations to consumers on whether there is or is not a risk of death to persons consuming GROW's kratom products. Your description should include but not be limited to verbal and written representations; marketing materials; contracts, forms, templates and commercial documentation; website and blog publications; correspondence, invoicing and e-mail communications with retailers; and scripts or guidance for salespersons, telemarketers, and/or retailers of GROW products.  In describing each representation or collection of representations, please include the location and content of each representation, the dates or timeframes of the representation(s), and the persons making the representations (including agents and affiliates) and the persons receiving the representations (including but not limited to consumers making online or telephone inquiries, or individuals raising complaints or concerns).

**ANSWER:  GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

11.     Please describe the nature and extent of any other representations you or your agents have made about the safety and efficacy of GROW's Kratom related to human health. Your description should include but not be limited to verbal and written representations; marketing materials; contracts, forms, templates and commercial documentation; website and blog publications; correspondence, invoicing and e-mail communications with retailers; and scripts or guidance for salespersons, telemarketers, and/or retailers of kratom products. In describing each representation or collection of representations, please include the location and content of each representation, the dates or timeframes of the representation(s), and the persons making the representations

(including agents and affiliates) and the persons receiving the representations (including but not limited to consumers making online or telephone inquiries, or individuals raising complaints or concerns).

**ANSWER:  GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

12.     Please describe the extent to which you have received information that adverse events may have been suffered by persons using GROW kratom products (such as reports, claims, complaints, or allegations that a product user has suffered or may have suffered addiction, withdrawal, overdose, seizures, disabilities, death, disruption to enjoyment of life, or other negative symptoms or side effects from a GROW product). Potential sources of such information would include, but not be limited to: medical professionals; suppliers; customers and consumers; retailers; comments or complaints submitted via website, social media, e-mail, or otherwise; communications from consumer family members; communications from regulatory or law enforcement officials; communications from local doctors; etc.

**ANSWER:  GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

13.     For each adverse event identified above, please describe what you did in response to the reported adverse event.  In your description, please include the dates, names and locations of the resulting activities identified, and any related reports, documentation, or analyses.

**ANSWER:  GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

14.     State your knowledge of any claims for damages for injury relating to kratom sold by GROW.  State the date you learned of the claim, the nature and alleged basis for the claim, the disposition of the claim, and the person(s) making each such claim (including their contact information).

**ANSWER:  GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

15.     Describe the extent of your knowledge regarding Krystal Talavera's death.  In your description, include the date and manner by which you first received notice of her death, and any ensuring response, investigation and/or actions taken because of the death.

**ANSWER:  GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

16.    Please describe the factual basis for any belief that GROW's kratom was not a cause of Krystal Talavera's death.  In your description, please detail the extent to which you believe: (1) there are other causes or persons (including but not limited to Ms. Talavera) who are at fault for Ms. Talavera's death; and (2) other causes for Ms. Talavera's death are greater than GROW's degree of fault.

**ANSWER:  GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

17.    State the name and present address of each person you expect to call as an expert witness at the trial of this action and for each such witness state:

(a)    The background, training, experience, and other qualifications of each such person;

(b)    The substance of each fact to which he or she is expected to testify;

(c)    The substance of each opinion to which he or she is expected to testify;

(d)    A summary of the grounds for each opinion;

(e)    Please have each such expert affix his/her signature to the Answer to this Interrogatory; or, in the alternative, attach to your answers to these Interrogatories a report signed by each such expert, incorporating the information contained in (b) through (d).

**ANSWER:  GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

18.    Except for those persons identified in the preceding Interrogatory, state the name and present address of any person who has been retained, employed or consulted by you as an expert in connection with the claim in this action or any defense to the claim in this action.

**ANSWER: GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

19.    Please describe any and all liability insurance policies in force and effect to provide liability insurance with respect to the damages that are the subject of this action, including any excess coverage policies. In your description, please include the name and address of each insurance company issuing each of said policies; the policy number of each of such policies; and the amount of liability insurance provided by each of such insurance policies for personal injuries.

**ANSWER:  GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

20.     Describe the extent to which any representative of you or your insurer has conducted any investigation on your behalf relating to the claim in this action or any defense to said claim. In your description, please state the name and address, employer, and job title, position or capacity of each such person, and whether any of the persons named have prepared any notes, memoranda or summaries in connection with any such investigation.

**ANSWER: No insurer has conducted an investigation. Grow has not conducted an investigation. Grow objects to the extent this seeks to invade the work product privilege as the only "investigation" conducted was by counsel after the instant lawsuit was filed.**

21.     Please set forth the factual basis that supports each affirmative defense you set forth in your Answer(s) to Plaintiff's Complaint, including any witnesses and documents that were relied upon when alleging the defense.  This request does not seek a dress rehearsal of GROW's anticipated position at trial, but merely seeks a reasonable summary of the facts that GROW believes sufficient to avoid a motion for summary judgment dismissal of each defense.

**ANSWER: Affirmative defenses were pled to avoid waiver. Specific facts are in the process of being developed.**

22.     Please specify the extent of GROW's knowledge about the quantities and qualities and content of the kratom products sold to Krystal Talavera. Your description should specify the bases for such knowledge, including any documentation of transactions between Krystal Talavera and GROW.

**ANSWER:  GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

23.     Please state the name, address, and telephone number, of the person(s) responding to each of these interrogatories, the requests for production of documents, and the requests for admissions. In your statement, include the specific discovery request(s) they assisted with (listed by request number), and the capacity in which the person responds on behalf of GROW.

**ANSWER:   GROW objects as overbroad and unduly burdensome as it was formed *after* Ms. Talavera's death to operate a brick and mortar retail store in a mall in Idaho, and was not in the business of selling, distributing, or marketing Kratom products.**

24.      Describe GROW's document retention and/or destruction policy regarding Kratom, including without limitation, the policy itself, and documents modifying, suspending or interpreting the policy.

**ANSWER: GROW did not have a document retention policy.**

<u>**REQUESTS FOR PRODUCTION OF DOCUMENTS**</u>

1.     All documents containing written or recorded statements made by any person, which relate to Krystal Talavera's death.

<u>**RESPONSE:**</u> **None.**


2.     All documents and materials relating to the investigation of Krystal Talavera's death. This request does not include documents and materials created by or for your lawyers after the filing of this lawsuit.

<u>**RESPONSE:**</u> **None.**


3.     Correspondence, reports, documents and materials of any kind providing information about the Subject Incident and its cause received by GROW from any other party or entity (exclusive of employees, agents, servants, attorneys and investigators of GROW) or sent by GROW to any other person or entity (exclusive of employees, agents, servants, attorneys and investigators of GROW).

<u>**RESPONSE:**</u> **None.**


4.     All experts' reports, including any tests, supporting data, calculations, or photographs, factual observations and reports or facts on which such experts intend to rely.

<u>**RESPONSE:**</u> **None.**


5.     All documents, films, computer recreations, test results, graphic evidence, demonstrative evidence, compilations of data, statistics, books, treatises or any other type of evidence whatsoever that support GROW's defense of this lawsuit. This includes items that are impeaching in nature.

<u>**RESPONSE:**</u> **None.**

6.     Statements of witnesses, whether written, recorded or otherwise memorialized, which support GROW's defense of this lawsuit.  This includes items that are impeaching in nature.

<u>**RESPONSE:**</u> **None.**

7.     All marketing materials, advertisements, brochures, catalogs, promotional materials, television commercials, and other documents and materials that mention, describe, or refer to the qualities, characteristics, capabilities, capacities and virtues of the GROW's kratom products sold between January 1, 2016 and January 1, 2022.

**RESPONSE: None.**

8.     All insurance agreements or policies under which any person or entity carrying on an insurance business may be liable to satisfy part or all of a judgment which may be rendered in this action or to indemnify or reimburse for payments made to satisfy any judgment.

**RESPONSE: None.**

9.     All documents and materials for every lawsuit, claim or complaint that has been made against GROW relating to a kratom product, wherein it was alleged that an injury or death may have resulted from ingesting a GROW's kratom product.

**RESPONSE: None other than this lawsuit.**

10.     Please produce all documents containing safety-related information about GROW's products that GROW has used or considered for its product consumers. This would include labels, warnings, disclaimers, guidance, or other information relating to the relative safety or danger of GROW products for human consumption. This would also include documents drafted, considered, proposed, rejected, and/or utilized for disseminating safety-related information; as well as correspondence, meeting agendas, minutes, notes, transcripts, worksheets, notices or reports which discuss or analyze, revised or new safety-related information for any GROW kratom product.

**RESPONSE: None.**

11.     Please provide GROW's governing corporate records (including amendments) since incorporation to present. This would include but not be limited to the   Certificate   of Organization; By-Laws;  Agreements;  Buy-Sell  Agreements; Licenses and other company authorizations for the sale of kratom products.

**RESPONSE: None.**

12.     Please produce all documentation relating to lab testing of GROW's kratom products, including lab testing documentation referenced or relied upon in  your response  to Interrogatory 7 above. Your response should include any and all testing standards, procedures, protocols, references and results for such testing.

**RESPONSE: None.**

13.     Please produce all contractual documents and agreements between GROW and entities, contractors, employees or other persons who have manufactured, processed and/or supplied kratom to GROW between January 1, 2016 and January 1, 2022.

**RESPONSE**: **None.**

     14.    Please produce all documents discussing or analyzing the risks, warnings, or harms associated with GROW's kratom products, including any documents relied upon or identified in preparing the response to Interrogatory 9 above.

**RESPONSE**: **None.**

     15.    Please produce all documents relating to the standards, policies, procedures, and/or practices used in preparing, marketing, and selling GROW's kratom products. This would include but not be limited to documents relating to and arising from efforts to qualify GROW's kratom products for the American Kratom  Association's Good Manufacturing Practice (GMP) Qualified Vendor Status, or any other manufacturing standards, such as industry or regulatory standards; and any other documents referenced or relied upon in your response to Interrogatory No. 5.

**RESPONSE**: **None.**

     16.    Please produce all documents discussing, referencing or arising from adverse events described in your responses to Interrogatories 12, 13, 14, and 15.

**RESPONSE**: **None.**

     17.    Please produce all documents regarding the marketing, distribution and sale of GROW's kratom products from between January 1, 2016 and January 1, 2022. These documents should include all proposals, contracts, agreements, warranties, invoices, marketing materials, labeling or other product guidance, and documentation of communications regarding GROW kratom products sold, including electronic communications.

**RESPONSE**:  **None.**

     18.    Please produce all documents which reflect or reference the effort by any defendant to gather information on the extent to which GROW's kratom products may be presenting a risk of harm to consumers of the product.

**RESPONSE**: **None.**

     19.    Please produce all documents which reflect GROW's effort to monitor the extent to which complications (such as overdose and/or death) are arising with  regard to kratom sold in the United States.

**RESPONSE**: **None.**

20.     Please provide all documents that GROW has exchanged with the American Kratom Association regarding the sale and distribution of kratom in the United States.

**RESPONSE: None.**

21.     Please provide all documents that GROW has provided, received, or exchanged with federal regulatory agencies (including but not limited to the FDA, the DEA, or the FTC) regarding GROW's kratom products.

**RESPONSE: None.**

22.     Please produce all documents and representations referenced or relied upon in preparing your response to Interrogatory 2, including but not limited to all copies of applications, submissions, notices, labels and/or branding prepared in connection with the federal regulations.

**RESPONSE: None.**

23.     Please provide all other documents referenced in your responses to the Interrogatories above, but not otherwise produced in the Requests for Production.

**RESPONSE: None.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 3, 2023, a true and correct copy of the foregoing was served via email on Michael J. Cowgill and Tamara J. Williams, mctlaw, mcowgill@mctlaw.com; twilliams@mctlaw.com; hdiener@mctlaw.com; and mpowell@mctlaw.com.

/s/ *Justin D. Niznik*

**JUSTIN D. NIZNIK**
Florida Bar No. 774901
**BOWMAN AND BROOKE LLP**
1064 Greenwood Boulevard - Suite 212
Lake Mary, Florida 32746-5419
(407) 585-7600
(407) 585-7610 – Fax

Designated email addresses:

*Attorneys for Defendants*
**GROW, LLC and**
**SEAN MICHAEL HARDER**

justin.niznik@bowmanandbrooke.com
kara.thomas@bowmanandbrooke.com
orfa.diaz@bowmanandbrooke.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CIVIL DIVISION

| | |
|---|---|
| **DEVIN FILIPPELLI, as Personal Representative of the ESTATE OF KRYSTAL TALAVERA, on behalf of the Estate and her Survivors,**<br><br>    **Plaintiff,**<br>**v.**<br><br>**GROW, LLC (d/b/a KD INCORPORATED and THE KRATOM DISTRO); and SEAN MICHAEL HARDER, individually**<br><br>    **Defendants.**<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Civil Action No. 9:22-cv-81731** |

### SEAN MICHAEL HARDER'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S INTERROGATORIES AND REQUESTS FOR DOCUMENTS

Defendant, **SEAN MICHAEL HARDER** ("Harder"), by and through his undersigned counsel, and pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, hereby serves his Responses to Plaintiff's First Set of Interrogatories and First Request for Production served on January 27, 2023, as follows:

### OBJECTIONS

1.    Harder objects to Plaintiff's Request for Production to the extent that its requests are vague, overly broad, and contain definitions contrary to ordinary and customary usage. Harder's responses assume common sense and common meaning.

2.    Harder objects to the extent that Plaintiffs' Request for Production seeks the production of attorney/client privileged communications, privileged work product or any other information or documents which are irrelevant, confidential, privileged or beyond the scope of

information or documents reasonably calculated to lead to the discovery of admissible evidence. A privilege log will be provided, upon Plaintiffs' request, in accordance with Florida law for any documents subject to attorney-client and/or work product privilege.

3.      Harder also objects to the extent that Plaintiffs' Request for Production seeks to impose unreasonable, unduly burdensome, or overly broad obligations upon Harder.

4.      The assertion of the same, similar, or additional objections or the provisions of partial answers in response to individual interrogatories does not waive any of Harder's general objections set forth as follows:

5.      Harder objects to any interrogatories requiring an answer containing information or identification of documents protected by the attorney, client and/or work product privileges.

6.      Harder objects to any interrogatories requiring an answer or documents containing information or identification of documents not reasonably calculated to lead to the discovery of admissible evidence.

7.      Harder has not completed a review of all documents related to this action, investigated all facts related to this action, interviewed all witnesses in this action, completed discovery in this action, or completed preparation for trial.  Consequently, the answers to interrogatories set forth herein are based upon information known or believed by Harder at the time these responses were prepared.  As such, Harder reserves the right to amend its responses set forth herein as discovery proceeds in this matter.

8.      Harder specifically reserves the right to challenge the competency, relevancy, materiality, and admissibility of, or to object on any ground to the use of, information or identification of documents set forth herein in any subsequent proceeding, trial, or any other action.

## RESPONSES TO INTERROGATORIES

1.      Please describe the person(s) responsible for the manufacture, sale, and/or distribution of kratom from HARDER's residence at 1061 North Cliff Creek Avenue, Meridian, Idaho 83426 between January 1, 2016 and January 1, 2022. In your response, please include the owners, officers, directors, managers, and/or affiliates overseeing HARDER's operations relating to the acquisition, manufacture, packaging, marketing, and sale of HARDER's kratom products to consumers.

**ANSWER:   Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry. *Pisciotti v. Stephens*, 940 So. 2d 1217 (Fla. 4th DCA 2006). Further, the interrogatory is over broad, not proportional to the needs of this case and unduly burdensome because Mr. Talavera passed away on June 20, 2021. This is not a chronic exposure toxic tort case. Plaintiff's own experts opine that the cause of death was acute mitragynine intoxication and Plaintiff has produced the package of the single product that Ms. Talavera allegedly ingested on that single date that allegedly caused her death. Therefore, asking about the entire scope of "manufacturing, sale, and/or distribution" of Kratom and any every person or entity involved over a six-year period, including after Ms. Talavera's death, seeks completely irrelevant information.**

2.      Please describe the extent to which you believe HARDER's kratom products sold to consumers are subject to the Federal Food, Drug, and Cosmetic Act (FDCA) and the Dietary Supplement Health and Education Act of 1994 (DSHEA). Your description should specify any FDCA and/or DSHEA regulations HARDER contends it has attempted to comply with, such as regulations governing premarket notifications, premarket analyses of safety and efficacy, development of manufacturing controls, labeling and branding requirements, and any exemptions from such regulations. If you believe HARDER's kratom products are not subject to FDCA and/or DSHEA, please specify the factual basis for that belief including any industry guidance received to support that belief.

**ANSWER:   Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry. *Pisciotti v. Stephens*, 940 So. 2d 1217 (Fla. 4th DCA 2006).**

3.      Please identify all importers, suppliers, manufacturers, distributors, or other sources who supplied kratom to HARDER between January 1, 2016 and January 1, 2022. In your answer, please include the name, address, and phone number for all distributors; suppliers; importers; manufacturers; the forms and specific kratom product types provided; and whether the facility where manufacturing takes place has been registered under the FDCA.

**ANSWER:   Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry. *Pisciotti v. Stephens*, 940 So. 2d 1217 (Fla. 4th DCA 2006).**

4.     Please describe the extent to which each person identified in the previous interrogatory supplied you with information about their kratom, including but not limited to information regarding the quality, safety, content, potencies, purities, properties, uses, misuses, benefits, risks, warnings, labeling and/or marketing of the kratom supplied. In your description specify the date(s) you received such information provided, the arrangements made, the form and content of the information, and the individuals involved in the exchange of information.

**ANSWER:  Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry. *Pisciotti v. Stephens*, 940 So. 2d 1217 (Fla. 4th DCA 2006).**

5.     Please describe the manufacturing processes followed with respect to the kratom products sold by HARDER between January 1, 2016 and January 1, 2022. Your description should include the standards, procedures and practices applied for each of HARDER's kratom product types, and the persons involved (whether HARDER, a HARDER affiliate, or an importer/manufacturer who is separate from HARDER). The term "standards" refers to any regulatory or industry standards, such as standards and/or related certifications utilized by the FDCA, DSHEA, the supplement industry, the American Kratom Association (AKA), or other entities. In your response, please specify the nature and extent of any audits or evaluations of compliance with such processes.

**ANSWER:  Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry. *Pisciotti v. Stephens*, 940 So. 2d 1217 (Fla. 4th DCA 2006). Further, the interrogatory is over broad, not proportional to the needs of the case and unduly burdensome because Mr. Talavera passed away on June 20, 2021. This is not a chronic exposure toxic tort case. Plaintiff's own experts opine that the cause of death was acute mitragynine intoxication and Plaintiff has produced the package of the single product that Ms. Talavera allegedly ingested on that single date that allegedly caused her death. Therefore, asking about the entire scope of "manufacturing, sale, and/or distribution" of Kratom and any every person or entity involved over a six-year period, including after Ms. Talavera's death, seeks completely irrelevant information.**

6.     Please identify all employees and contractors who have been paid by HARDER to assist in the production and sale of kratom products between January 1, 2016 and January 1, 2022. This includes employees and contractors involved in the ordering, manufacture, refining, packaging, marketing and distribution of those kratom products, as well as any other HARDER's administrative and/or business operations. In your identification, please include the name and contact information for each employee and contractor, the dates of employment and/or contracts, and the nature of the employment and services paid for.

**ANSWER: Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry. *Pisciotti v. Stephens*, 940 So. 2d 1217 (Fla. 4th DCA 2006). Further, the interrogatory is over broad, not proportional to the needs of the case and unduly burdensome because Mr. Talavera passed away on June 20, 2021. This is not a chronic exposure toxic tort case. Plaintiff's own experts opine that the cause of death was acute mitragynine intoxication and Plaintiff has produced the package of the single product that Ms. Talavera allegedly ingested on that single date that allegedly caused her death. Therefore, asking about the entire scope**

of "manufacturing, sale, and/or distribution" of Kratom and any every person or entity involved over a six-year period, including after Ms. Talavera's death, seeks completely irrelevant information.

7.      Please describe the extent to which the kratom products sold by HARDER between January 1, 2016 and January 1, 2022 were lab tested. In your description specify the person's responsible for testing HARDER's kratom, and the type of testing utilized -- including but not limited to any testing for heavy metals, specific alkaloids, product purity, and/or product potency. Your response should include the extent to which each of your specific kratom product types (i.e., Space Dust, Green Maeng, Green Horned Maeng Da, Green Riau, etc.) were or were not all subject to the testing described.

**ANSWER:** **Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens*, **940 So. 2d 1217 (Fla. 4th DCA 2006). Further, the interrogatory is over broad, not proportional to the needs of the case and unduly burdensome because Mr. Talavera passed away on June 20, 2021. This is not a chronic exposure toxic tort case. Plaintiff's own experts opine that the cause of death was acute mitragynine intoxication and Plaintiff has produced the package of the single product that Ms. Talavera allegedly ingested on that single date that allegedly caused her death. Therefore, asking about the entire scope of "manufacturing, sale, and/or distribution" of Kratom and any every person or entity involved over a six-year period, including after Ms. Talavera's death, seeks completely irrelevant information.**

8.      Please describe the differences in quality and content for HARDER's kratom products offered for sale between January 1, 2016 and January 1, 2022. In your description include the full extent of your knowledge about HARDER's kratom products' biological and psychoactive compounds (and potencies thereof), purity (including heavy metal content), strains, and variability in any of the foregoing. Your description should specify the bases for such knowledge, including all testing results, and testing processes.

**ANSWER:** **Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens*, **940 So. 2d 1217 (Fla. 4th DCA 2006).**

9.      Please describe the extent to which HARDER has familiarized himself with the risks and dangers associated with the human consumption of HARDER's kratom products. This would include HARDER's efforts to identify and address risks from kratom, and the types of risks HARDER believes his consumers would expect to be notified about (for instance, what if anything has HARDER done to ascertain the risks of overdose or death from kratom use?). In your description, please explain when and how you became aware of each particular risk of harm described in your response.

**ANSWER:** **Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens*, **940 So. 2d 1217 (Fla. 4th DCA 2006).**

10.    Please describe the nature and extent of your representations to consumers on whether there is or is not a risk of death to persons consuming HARDER's kratom products. Your description should include but not be limited to verbal and written representations; marketing materials; contracts, forms, templates and commercial documentation; website and blog publications; correspondence, invoicing and e-mail communications with retailers; and scripts or guidance for salespersons, telemarketers, and/or retailers of HARDER products. In describing each representation or collection of representations, please include the location and content of each representation, the dates or timeframes of the representation(s), and the persons making the representation (including agents and affiliates) and the persons receiving the representations (including but not limited to consumers making online or telephone inquiries, or individuals raising complaints or concerns).

**ANSWER: Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens*, **940 So. 2d 1217 (Fla. 4th DCA 2006).**

11.    Please describe the nature and extent of any other representations you or your agents have made about the safety and efficacy of HARDER's Kratom related to human health. Your description should include but not be limited to verbal and written representations; marketing materials; contracts, forms, templates and commercial documentation; website and blog publications; correspondence, invoicing and e-mail communications with retailers; and scripts or guidance for salespersons, telemarketers, and/or retailers of kratom products. In describing each representation or collection of representations, please include the location and content of each representation, the dates or timeframes of the representation(s), and the persons making the representations (including agents and affiliates) and the persons receiving the representations (including but not limited to consumers making online or telephone inquiries, or individuals raising complaints or concerns).

**ANSWER: Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens*, **940 So. 2d 1217 (Fla. 4th DCA 2006).**

12.    Please describe the extent to which you have received information that adverse events may have been suffered by persons using HARDER kratom products (such as reports, claims, complaints, or allegations that a product user has suffered or may have suffered addiction, withdrawal, overdose, seizures, disabilities, death, disruption to enjoyment of life, or other negative symptoms or side effects from a HARDER product). Potential sources of such information would include, but not be limited to: medical professionals; suppliers; customers and consumers; retailers; comments or complaints submitted via website, social media, e-mail, or otherwise; communications from consumer family members; communications from regulatory or law enforcement officials; communications from local doctors; etc.

**ANSWER: Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens*, **940 So. 2d 1217 (Fla. 4th DCA 2006).**

13.     For each adverse event identified above, please describe what you did in response to the reported adverse event. In your description, please include the dates, names and locations of the resulting activities identified, and any related reports, documentation, or analyses.

**ANSWER:** **Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens***, 940 So. 2d 1217 (Fla. 4th DCA 2006).**

14.     State your knowledge of any claims for damages for injury relating to kratom sold by HARDER. State the date you learned of the claim, the nature and alleged basis for the claim, the  disposition of the claim, and the person(s) making each such claim (including their contact information).

**ANSWER:** **Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens***, 940 So. 2d 1217 (Fla. 4th DCA 2006).**

15.     Describe the extent of your knowledge regarding Krystal Talavera's death. In your description, include the date and manner by which you first received notice of her death, and any ensuring response, investigation and/or actions taken because of the death.

**ANSWER:** **Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens***, 940 So. 2d 1217 (Fla. 4th DCA 2006).**

16.     Please describe the factual basis for any belief that HARDER's kratom was not a cause of Krystal Talavera's death. In your description, please detail the extent to which you believe: (1) there are other causes or persons (including but not limited to Ms. Talavera) who are at fault for Ms. Talavera's death; and (2) other causes for Ms. Talavera's death are greater than HARDER's degree of fault.

**ANSWER:** **Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens***, 940 So. 2d 1217 (Fla. 4th DCA 2006).**

17.     State the name and present address of each person you expect to call as an expert witness at the trial of this action and for each such witness state:

a.     The background, training, experience, and other qualifications of each such person;
b.     The substance of each fact to which he or she is expected to testify;
c.     The substance of each opinion to which he or she is expected to testify;
d.     A summary of the grounds for each opinion;
e.     Please have each such expert affix his/her signature to the Answer to this Interrogatory; or, in the alternative, attach to your answers to these Interrogatories a report signed by each such expert, incorporating the information contained in (b) through (d).

**ANSWER:**     **No expert witnesses have been retained at this time.**

18.     Except for those persons identified in the preceding Interrogatory, state the name and present address of any person who has been retained, employed or consulted by you as an expert in connection with the claim in this action or any defense to the claim in this action.

**<u>ANSWER</u>: Not applicable.**

19.     Please describe any and all liability insurance policies in force and effect to provide liability insurance with respect to the damages that are the subject of this action, including any excess coverage policies. In your description, please include the name and address of each insurance company issuing each of said policies; the policy number of each of such policies; and the amount of liability insurance provided by each of such insurance policies for personal injuries.

**<u>ANSWER</u>: None.**

20.     Describe the extent to which any representative of you or your insurer has conducted any investigation on your behalf relating to the claim in this action or any defense to said claim. In your description, please state the name and address, employer, and job title, position or capacity of each such person, and whether any of the persons named have prepared any notes, memoranda or summaries in connection with any such investigation.

**<u>ANSWER</u>:     Mr. Harder objects to this Interrogatory as it seeks information about what his attorneys have done in response to this lawsuit and claim and violates the attorney-work product privilege.**

21.     Please set forth the factual basis that supports each affirmative defense you set forth in your Answer(s) to Plaintiff's Amended Complaint, including any witnesses and documents that were relied upon when alleging the defense. This request does not seek a dress rehearsal of HARDER's anticipated position at trial, but merely seeks a reasonable summary of the facts that HARDER believes sufficient to avoid a motion for summary judgment dismissal of each defense.

**<u>ANSWER</u>:     Affirmative defenses were plead to avoid waiver. Discovery is ongoing.**

22.     Please specify the extent of HARDER's knowledge about the quantities and qualities and content of the kratom products sold to Krystal Talavera. Your description should specify the bases for such knowledge, including any documentation of transactions between Krystal Talavera and HARDER.

**<u>ANSWER</u>: Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry. *Pisciotti v. Stephens*, 940 So. 2d 1217 (Fla. 4th DCA 2006).**

23.     Please state the name, address, and telephone number, of the person(s) responding to each of these interrogatories, the requests for production of documents, and the requests for admissions. In your statement, include the specific discovery request(s) they assisted with (listed by request number), and the capacity in which the person responds on behalf of HARDER.

**<u>ANSWER</u>: Mr. Harder with the assistance of counsel.**

24.    Describe HARDER'S document retention and/or destruction policy regarding Kratom, including without limitation, the policy itself, and documents modifying, suspending or interpreting the policy.

**ANSWER: Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry. *Pisciotti v. Stephens*, 940 So. 2d 1217 (Fla. 4th DCA 2006).**

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.    All documents containing written or recorded statements made by any person, which relate to Krystal Talavera's death.

**RESPONSE: Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry. *Pisciotti v. Stephens*, 940 So. 2d 1217 (Fla. 4th DCA 2006).**

2.    All documents and materials relating to the investigation of Krystal Talavera's death. This request does not include documents and materials created by or for your lawyers after the filing of this lawsuit.

**RESPONSE: Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry. *Pisciotti v. Stephens*, 940 So. 2d 1217 (Fla. 4th DCA 2006).**

3.    Correspondence, reports, documents and materials of any kind providing information about the Subject Incident and its cause received by HARDER from any other party or entity (exclusive of, attorneys and investigators of HARDER) or sent by HARDER to any other person or entity (exclusive of attorneys and investigators of HARDER).

**RESPONSE: Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry. *Pisciotti v. Stephens*, 940 So. 2d 1217 (Fla. 4th DCA 2006).**

4.    All experts' reports, including any tests, supporting data, calculations, or photographs, factual observations and reports or facts on which such experts intend to rely.

**RESPONSE: Not applicable.**

5.    All documents, films, computer recreations, test results, graphic evidence, demonstrative evidence, compilations of data, statistics, books, treatises or any other type of evidence whatsoever that support HARDER's defense of this lawsuit. This includes items that are impeaching in nature.

**RESPONSE: None.**

6.      Statements of witnesses, whether written, recorded or otherwise memorialized, which support HARDER's defense of this lawsuit. This includes items that are impeaching in nature.

**RESPONSE: None.**

7.      All marketing materials, advertisements, brochures, catalogs, promotional materials, television commercials, and other documents and materials that mention, describe, or refer to the qualities, characteristics, capabilities, capacities and virtues of the HARDER's kratom products sold between January 1, 2016 and January 1, 2022.

**RESPONSE: Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens*, **940 So. 2d 1217 (Fla. 4th DCA 2006).**

8.      All documents associated with or otherwise relating to HARDER's document retention and/or destruction policy, including without limitation, the policy itself, and documents modifying, suspending or interpreting the policy.

**RESPONSE:  Mr. Harder does not have a document retention policy.**

9.      All insurance agreements or policies under which any person or entity carrying on an insurance business may be liable to satisfy part or all of a judgment which may be rendered in this action or to indemnify or reimburse for payments made to satisfy any judgment.

**RESPONSE: None.**

10.     All documents and materials for every lawsuit, claim or complaint that has been made against HARDER relating to a kratom product, wherein it was alleged that an injury or death may have resulted from ingesting a HARDER's kratom product.

**RESPONSE: None other than this lawsuit.**

11.     Please produce all documents containing safety-related information about HARDER's products that HARDER has used or considered for its product consumers. This would include labels, warnings, disclaimers, guidance, or other information relating to the relative safety or danger of HARDER products for human consumption. This would also include documents drafted, considered, proposed, rejected, and/or utilized for disseminating safety-related information; as well as correspondence, meeting agendas, minutes, notes, transcripts, worksheets, notices or reports which discuss or analyze, revised or new safety-related information for any HARDER kratom product.

**RESPONSE: Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens*, **940 So. 2d 1217 (Fla. 4th DCA 2006).**

12.     Please produce all documentation relating to lab testing of HARDER's kratom products, including lab testing documentation referenced or relied upon in your response to Interrogatory 7 above. Your response should include any and all testing standards, procedures, protocols, references and results for such testing.

**RESPONSE: Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry. *Pisciotti v. Stephens*, 940 So. 2d 1217 (Fla. 4th DCA 2006).**

13.     Please produce all contractual documents and agreements between HARDER and entities, contractors, employees or other persons who have manufactured, processed and/or supplied kratom to HARDER between January 1, 2016 and January 1, 2022.

**RESPONSE:  Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry. *Pisciotti v. Stephens*, 940 So. 2d 1217 (Fla. 4th DCA 2006).**

14.     Please produce all documents discussing or analyzing the risks, warnings, or harms associated with HARDER's kratom products, including any documents relied upon or identified in preparing the response to Interrogatory 9 above.

**RESPONSE: Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry. *Pisciotti v. Stephens*, 940 So. 2d 1217 (Fla. 4th DCA 2006).**

15.     Please produce all documents relating to the standards, policies, procedures, and/or practices used in preparing, marketing, and selling HARDER's kratom products. This would include but not be limited to documents relating to and arising from efforts to qualify HARDER's kratom products for the American Kratom Association's Good Manufacturing Practice (GMP) Qualified Vendor Status, or any other manufacturing standards, such as industry or regulatory standards; and any other documents referenced or relied upon in your response to Interrogatory No. 5.

**RESPONSE: Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry. *Pisciotti v. Stephens*, 940 So. 2d 1217 (Fla. 4th DCA 2006).**

16.     Please produce all documents discussing, referencing, or arising from adverse events described in your responses to Interrogatories 12, 13, 14, and 15.

**RESPONSE: Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry. *Pisciotti v. Stephens*, 940 So. 2d 1217 (Fla. 4th DCA 2006).**

17.     Please produce all documents regarding the marketing, distribution and sale of HARDER's kratom products from between January 1, 2016 and January 1, 2022. These documents should include all proposals, contracts, agreements, warranties, invoices, marketing materials, labeling or other product guidance, and documentation of communications regarding HARDER kratom products sold, including electronic communications.

**RESPONSE:** **Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens*, **940 So. 2d 1217 (Fla. 4th DCA 2006).**

18.     Please produce all documents which reflect HARDER's effort to monitor the extent to which complications (such as overdose and/or death) are arising with regard to kratom sold in the United States.

**RESPONSE:** **Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens*, **940 So. 2d 1217 (Fla. 4th DCA 2006).**

19.     Please provide all documents that HARDER has exchanged with the American Kratom Association regarding the sale and distribution of kratom in the United States.

**RESPONSE:** **Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens*, **940 So. 2d 1217 (Fla. 4th DCA 2006).**

20.     Please provide all documents that HARDER has provided, received, or exchanged with federal regulatory agencies (including but not limited to the FDA, the DEA, or the FTC) regarding HARDER's kratom products.

**RESPONSE:** **Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens*, **940 So. 2d 1217 (Fla. 4th DCA 2006).**

21.     Please produce all documents and representations referenced or relied upon in preparing your response to Interrogatory 2, including but not limited to all copies of applications, submissions, notices, labels and/or branding prepared in connection with the federal regulations.

**RESPONSE:** **Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens*, **940 So. 2d 1217 (Fla. 4th DCA 2006).**

22.     Please provide all other documents referenced in your responses to the Interrogatories above, but not otherwise produced in the Requests for Production.

**RESPONSE:** **None.**

23.     Please produce all text messages, voicemails, social media posts, blog posts, and any other form of electronic communication or media between January 1, 2016 and January 1, 2022, that you have authored and/or published which references or discusses Kratom.

**RESPONSE:** **Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens*, **940 So. 2d 1217 (Fla. 4th DCA 2006). Further, this request is over broad, not proportional to the needs of this csae and unduly burdensome because Mr. Talavera passed away on June 20, 2021. This is not a chronic exposure toxic tort case. Plaintiff's own experts opine that the cause of death was acute mitragynine intoxication and Plaintiff has produced the package of the single product that Ms. Talavera allegedly ingested on that single date that allegedly caused her death. Therefore, seeking all the above materials**

over a six-year period is overbroad to the extreme.

24.     Please describe the extent to which you sought guidance on kratom from a medical provider, or any other person or entity that you believe was qualified to provide reliable guidance on kratom's safety, efficacy, toxicology and/or pharmacology. In your description, please identify the dates that any guidance was sought and received, the persons or entities providing such guidance, the substance of the guidance, and its form (written, verbal, electronic, etc.).

**RESPONSE**: **Mr. Harder objects as this Request for Production asks for him to describe the extent to which he did something which is not a proper document request. To the extent this is deemed an interrogatory, Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens*, **940 So. 2d 1217 (Fla. 4th DCA 2006).**

25.     Please describe the extent to which you sought and received guidance on the safety and efficacy of kratom from any persons other than those described in the preceding interrogatory. In your description please identify the dates guidance was sought and received, the persons or entities providing the guidance, and the substance and form of the guidance.

**RESPONSE**: **Mr. Harder objects as this Request for Production asks for him to describe the extent he did something which is not a proper document request. To the extent this is deemed an interrogatory, Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens*, **940 So. 2d 1217 (Fla. 4th DCA 2006).**

26.     Please describe your personal experience with kratom use. In your description, please identify the specific kratom products and forms of kratom used; the amount and frequency of your use; how that use has changed through the years; the reasons why you have increased or decreased your use of kratom; any adverse effects from your kratom use; and the nature and extent of any guidance you have sought treatment or guidance from medical providers or other qualified professionals related to your kratom use.

**RESPONSE**: **Mr. Harder objects as this Request for Production asks for him to describe the extent he did something which is not a proper document request. To the extent this is deemed an interrogatory, Mr. Harder asserts his Fifth Amendment privilege in response to this inquiry.** *Pisciotti v. Stephens*, **940 So. 2d 1217 (Fla. 4th DCA 2006).**

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that on March 3, 2023, a true and correct copy of the foregoing was served via email on Michael J. Cowgill and Tamara J. Williams, mctlaw, mcowgill@mctlaw.com;     twilliams@mctlaw.com;     hdiener@mctlaw.com;    and mpowell@mctlaw.com.

<table>
<tr><td></td><td>/s/ <em>Justin D. Niznik</em></td></tr>
<tr><td></td><td><strong>JUSTIN D. NIZNIK</strong></td></tr>
<tr><td></td><td>Florida Bar No. 774901</td></tr>
<tr><td></td><td><strong>BOWMAN AND BROOKE LLP</strong></td></tr>
<tr><td>Designated email addresses:</td><td>1064 Greenwood Boulevard - Suite 212</td></tr>
<tr><td></td><td>Lake Mary, Florida 32746-5419</td></tr>
<tr><td></td><td>(407) 585-7600</td></tr>
<tr><td></td><td>(407) 585-7610 – Fax</td></tr>
<tr><td>justin.niznik@bowmanandbrooke.com</td><td><strong><em>Attorneys for Defendants</em></strong></td></tr>
<tr><td>kara.thomas@bowmanandbrooke.com</td><td><strong>GROW, LLC and</strong></td></tr>
<tr><td>orfa.diaz@bowmanandbrooke.com</td><td><strong>SEAN MICHAEL HARDER</strong></td></tr>
</table>

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CIVIL DIVISION

**DEVIN FILIPPELLI as**
**Personal Representative of the**                    **CASE NO.: 9:22-cv-81731**
**ESTATE OF KRYSTAL TALAVERA,**
**on behalf of the Estate and her Survivors,**

**Plaintiff,**

**v.**

**GROW, LLC (b/d/a KD INCORPORATED**
**and THE KRATOM DISTRO); and SEAN**
**MICHAEL HARDER, individually.**
**a California corporation.**

**Defendant.**

## SUBPOENA TO PRODUCE DESIGNATED DOCUMENTS
## IN A CIVIL ACTION

**TO:   U.S. Customs and Border Protection**

C/O:  Office of Chief Counsel
      1300 Pennsylvania Ave, Suite 4.4-B
      Washington, D.C. 20229

    **PLEASE TAKE NOTICE,** pursuant to Federal Rule of Civil Procedure 45,
you are commanded to produce at the time, date, and place set forth below the
following documents, electronically stored information, or objects, and to permit
inspection, copying, testing, or sampling of the material outlined in Exhibit A.

    Place: **mctlaw**
          1605 Main Street, Suite 710
          Sarasota, Florida  34236

    Date:  March 27, 2023

    Time: 9:00 AM

**Exhibit D**

You may also send the requested documents by electronic mail to counsel on or before the date and time specified above. If you wish to produce the documents by mail, please mail the documents to Attn: Heather Diener, mctlaw, 1605 Main Street, Suite 710, Sarasota, Florida 34236. If alternative delivery arrangements are necessary, please contact me directly at: 941-201-3002.

The following provisions of Federal Rule of Civil Procedure 45 are attached, Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Dated: March 10, 2023

Respectfully,

_____
Michael Cowgill, Esq.
**mctlaw**
1605 Main Street, Suite 710
Sarasota, FL 34236
Phone: 888-952-5242
Fax: 941-952-5042
Email: mcowgill@mctlaw.com
Email: hdiener@mctlaw.com

*Attorneys for Plaintiff*

## Exhibit A

## Definitions

1. The term "DOCUMENT" shall mean the original and all non-identical copies and drafts, regardless of origin or location, of any writing and any written, printed, typed, or other graphic or photographic matter of any kind or description, in draft or final form, including, but not limited to, correspondence, letters, telegrams, facsimiles, cables, telex messages, e-mail, memoranda, notes, interoffice and interdepartmental communications, transcripts, minutes of conversations or meetings, reports, studies, any audio or video recordings, voicemail, contracts, calendar or diary entries, pamphlets, handwritten notes, charts, tabulations, records of meetings, conferences, telephone or other conversations or communications, and tapes or slides, and other data compilations from which information can be obtained or translated.

2. The term "COPY" shall mean a reproduction or duplicate of an original document.

3. The term "CONCERN" shall mean relating to, referring to, describing, evidencing, on constituting, in whole or in part, directly or indirectly, the stated subject matter.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1. Complete copies of all bills of lading from July 1, 2018 – July 1, 2021 concerning buyer/consignee: Sean Harder; supplier/shipper PT Aditama Sentosa Indonesia; and cargo description: green tea powder fertilizer HS Code: 3101.00.99.

2. Complete copies of all bills of lading from July 1, 2018 – July 1, 2021 concerning buyer/consignee: Sean Harder; supplier/shipper PT Tiga Cemara Sentosa; and cargo description: green tea powder fertilizer HS Code: 3101.00.99.

3. Complete copies of bills of lading from July 1, 2018 – July 1, 2021 concerning buyer/consignee: Sean Harder; supplier/shipper PT Aditama Sentosa Indonesia; and cargo description: mitragyna speciosa powder H.S. Code: 2525.20.

4. Complete copies of bills of lading from July 1, 2018 – July 1, 2021 concerning buyer/consignee: Sean Harder; supplier/shipper PT Tiga Cemara Sentosa; and cargo description: mitragyna speciosa powder H.S. Code: 2525.20.

5. Complete copies of shipping receipts from July 1, 2018 – July 1, 2021 concerning buyer/consignee: Sean Harder; supplier/shipper PT Aditama Sentosa Indonesia; and cargo description: green tea powder fertilizer HS Code: 3101.00.99.

6. Complete copies of shipping receipts from July 1, 2018 – July 1, 2021 concerning buyer/consignee: Sean Harder; supplier/shipper PT Tiga Cemara Sentosa; and cargo description: green tea powder fertilizer HS Code: 3101.00.99.

7. Complete copies of shipping receipts from July 1, 2018 – July 1, 2021 concerning buyer/consignee: Sean Harder; supplier/shipper PT Aditama Sentosa Indonesia; and cargo description: mitragyna speciosa powder H.S. Code: 2525.20.

8. Complete copies of shipping receipts from July 1, 2018 – July 1, 2021 concerning buyer/consignee: Sean Harder; supplier/shipper PT Tiga Cemara Sentosa; and cargo description: mitragyna speciosa powder H.S. Code: 2525.20.

9. Complete copies of entry summary documents, CBP form 7501, CBP 7533, and CBP 3461 concerning Sean Harder from July 1, 2018 – July 1, 2021, regarding cargo description: green tea powder fertilizer HS Code: 3101.00.99.

10. Complete copies of entry summary documents, CBP form 7501, CBP 7533, and CBP 3461 concerning Sean Harder from July 1, 2018 – July 1, 2021, regarding cargo description: mitragyna speciosa powder H.S. Code: 2525.20.

11. Complete copies of entry summary documents, CBP form 7501, CBP 7533, and CBP 3461, concerning Sean Harder and Ability Customs Brokers, 13910 Doolittle Drive, Sean Leandro, CA 94577, regarding cargo description: mitragyna speciosa powder H.S. Code: 2525.20.

**\*\*\*NOTE: The address and telephone number associated with Sean Harder is as follows:**

Address: 1061 N. Cliff Creek Ave, Meridian, ID 83642
      (some records may reflect an address of: 1061 N. Clift Creek Ave, Meridian, ID 83642)

Telephone: 208-713-0742

## Federal Rule of Civil Procedure 45. Subpoena

**(d) PROTECTING A PERSON SUBJECT TO A SUBPOENA; ENFORCEMENT.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) DUTIES IN RESPONDING TO A SUBPOENA.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause,

considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.



3811 Corporex Park Drive
Tampa, Florida 33619

TP-2023-00148 KEM

March 22, 2023

Via Electronic Mail to: mcowgill@mctlaw.com
Michael Cowgill, Esq.
mctlaw
1605 Main Street, Suite 710
Sarasota, FL 34236

Re:   The Estate of Krystal Talavera v. GROW LLC
      Case No. 9:22-cv-81731

Dear Mr. Cowgill:

This letter responds to the Subpoena to Produce Designated Documents in a Civil Action
("Subpoena") received by U.S. Customs and Border Protection ("CBP" or "Agency") on or about
March 13, 2023, regarding the above-referenced action.  In the Subpoena, you seek bills of lading,
shipping receipts and entry summary documents, CBP Forms 7501, CBP Forms 7533 and CBP
Forms 3461 concerning Sean Harder, PT Aditama Sentosa Indonesia, and PT Tiga Cemara Sentosa

The United States Supreme Court has specifically recognized the authority of a federal agency to
restrict the production of information, documentation, and/or testimony of its subordinate
employees. *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951); *Boske v. Comminfore*, 177
U.S. 459 (1900). The procedures for requesting CBP information in any proceeding in which the
U.S. Government is not a party are set forth in 19 C.F.R. Part 103, Subpart B. In particular, Section
103.22(c) of these regulations explains the requesting party's initial burden in the event of a
demand for CBP information in any civil proceeding. It provides in relevant part:

> A party seeking CBP information shall serve on the appropriate CBP employee the
> demand, a copy of the Summons and Complaint, and provide an affidavit, or, if that
> is not feasible, a statement that sets forth a summary of the documents or testimony
> sought and its relevance to the proceeding.

Your request is not in compliance with this requirement. Therefore, we could not evaluate the
Subpoena under the provisions of 19 C.F.R. § 103.22(f), which permits the production of CBP
documents only if disclosure is appropriate under those factors specified in 19 C.F.R. § 103.23(a),
and if none of the factors specified in 19 C.F.R. § 103.23(b) exist with respect to such CBP
documents.

**Exhibit E**

Nevertheless, after evaluating the Subpoena without the benefit of the information noted above, CBP will not comply with the Subpoena for reasons that include, but are not necessarily limited to, the following:

- There is no evidence that the documentation is relevant or material to the pending action (19 C.F.R. § 103.23(a)(3)(i));

- There is no evidence that the documentation is genuinely necessary to the proceeding (19 C.F.R. § 103.23(a)(3)(ii));

- The information sought appears to be available from other sources (19 C.F.R. § 103.23(a)(3)(iii));

- There is no evidence that the request is reasonable in scope (19 C.F.R. § 103.23(a)(3)(iv));

- Disclosure would violate the Trade Secrets Act, 18 U.S.C. § 1905 (19 C.F.R. § 103.23(b)(1));

- Disclosure would improperly reveal confidential commercial information without the owner's consent (*e.g.,* entry information) (19 C.F.R. § 103.23(b)(6));

- Disclosure may relate to documents which were produced by another agency or entity (19 C.F.R. § 103.23(b)(7)); and

- CBP has no interest in the above-referenced matter (19 C.F.R. § 103.23(b)(9)).

Furthermore, it has been determined that it is unacceptable for CBP to become embroiled in this type of action when there is no real need for CBP to do so. Production of CBP documents in response to this Subpoena entails the expenditure of public resources for a purely private purpose. Accordingly, CBP will not search for any of the requested documents. If you have any questions, you may contact me at (813) 623-6331, ext. 1.

Sincerely,

Karen E. Makkreel
Assistant Chief Counsel

**From:** Tamara J. Williams <twilliams@mctlaw.com>
**Sent:** Thursday, March 23, 2023 5:03 PM
**To:** MAKKREEL, KAREN E (OCC) <KAREN.MAKKREEL@CBP.DHS.GOV>
**Cc:** Michael Cowgill <mcowgill@mctlaw.com>; Talis Abolins <tabolins@mctlaw.com>; Heather Diener
<hdiener@mctlaw.com>
**Subject:** Estate of Krystal Talavera v. GROW LLC et al. (9:22-cv-81731)

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the
sender. If you feel this is a suspicious-looking email, please report by using the Report Phish button option.

Good afternoon Ms. Makkreel,

We are in receipt of CBP's response to our subpoena dated March 13, 2023. Attached is the summons,
complaint, and affidavit regarding the above-referenced matter. Additionally, we would like to schedule a time
to discuss. We are available to discuss the week of April 3rd **except** on April 4th from 1pm - 3:30pm. Please let us
know what date and time is best and we will give you a call.

Tamara

**Tamara J. Williams**, Esq.
twilliams@mctlaw.com

**mctlaw**
1605 Main Street, Suite 710
Sarasota, FL 34236
Office: 888.952.5245



This message is personal and confidential. If you have received it and it is not intended for you, please delete the message
immediately and via reply e-mail inform the sender of your unintended receipt of the message. No attorney-client
relationship can be established with **mctlaw** absent a signed retainer agreement signed by an authorized attorney
from **mctlaw**.

Exhibit F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CIVIL DIVISION

DEVIN FILIPPELLI, as
Personal Representative of the
ESTATE OF KRYSTAL TALAVERA,                    CASE NO: 9:22-cv-81731
on behalf of the Estate and her
Survivors,

                    Plaintiff,

vs.

GROW, LLC (d/b/a KD INCORPORATED
and THE KRATOM DISTRO); and
SEAN MICHAEL HARDER, individually.

                    Defendants.


### AFFIDAVIT OF TAMARA J. WILLIAMS, ESQ. PURSUANT TO 19 C.F.R. § 103.22(C)

I, Tamara J. Williams, Esq., state the following concerning documents sought from U.S. Customs and Border Protection ("CBP") through party subpoena, and its relevance to the above-captioned case.

1. On June 20, 2021, thirty-nine year old Krystal Talavera ("Krystal"), died as a result of acute mitragynine (kratom) toxicity.

2. Krystal regularly and routinely purchased kratom from Defendants, GROW LLC (d/b/a KD Incorporated and The Kratom Distro) ("GROW") and Sean Michael Harder ("Harder") under the belief that kratom was an all-natural and safe dietary supplement.

3. On November 4, 2023, Plaintiff initiated a wrongful death action against Defendants GROW and Harder, alleging strict products liability, breach of warranty, fraudulent misrepresentation, and negligence.

4. Kratom is an herbal extract derived from the leaves of Mitragyna speciosa, a tropical tree native to Southeast Asia.

5. Although kratom is not formally classified as an opiate, Kratom contains dozens of psychoactive compounds or alkaloids, many of which are not understood.

6. The two (2) most-studied alkaloids are mitragynine and 7-hydroxymitragynine. These two alkaloids bind to the same opioid brain receptors as morphine. Like opiates, these compounds can lead to analgesia (release of pain), euphoria, and sedation.

7. Kratom is not approved for medical purposes, and Kratom is illegal in several states and cities.

8. Kratom is not FDA approved. The FDA issued numerous warnings against the use of products containing Kratom or its psychoactive compounds and has taken action against those who illegally sell the product for pain treatment and other medical uses.

9. Kratom is not approved for importation and distribution in interstate commerce without a premarket substantiation that the product containing Kratom is reasonably safe for human consumption. The FDA has issued numerous warnings to companies importing and selling Kratom for human consumption and for medicinal purposes. Federal officials have also pursued enforcement actions against those illegally importing and selling adulterated and misbranded products.[1]

---

[1] See FDA and Kratom  (https://www.fda.gov/news-events/public-health-focus/fda-and-kratom) (last accessed Mar. 23, 2022); See also FDA issues warnings to companies selling illegal, unapproved kratom drug products marketed for opioid cessation, pain treatment and other medical uses (https://www.fda.gov/news-events/press-announcements/fda-issues-warnings-companies-selling-illegal-unapproved-kratom-drug-products-marketed-opioid) (last accessed March 23, 2023); see also DOJ DEA Drug Fact Sheet – Kratom (https://www.dea.gov/sites/default/files/2020-06/Kratom-2020_0.pdf) (last accessed Mar. 23, 2022).

10. Defendants, GROW and Harder are in the business of manufacturing, distributing, importing, supplying, and/or selling kratom to U.S. consumers.

11. On March 13, 2023, Plaintiff sent a subpoena to CBP, seeking specific documents that would identify those companies, entities, and/or individuals that supplied the kratom products to Defendant's that ultimately killed Krystal.

12. CBP is required to consider the following factors in determining whether to disclose information:

**(1)** Whether the disclosure would be appropriate under the relevant substantive law concerning privilege;

**(2)** Whether the disclosure would be appropriate under the rules of procedure governing the case or matter in which the demand arose; and,

**(3)** Whether the requesting party has demonstrated that the information requested is:

**(i)** Relevant and material to the action pending, based on copies of the summons and complaint that are required to be attached to the subpoena *duces tecum* or other demand;

**(ii)** Genuinely necessary to the proceeding, *i.e.,* a showing of substantial need has been made;

**(iii)** Unavailable from other sources; and,

**(iv)** Reasonable in its scope, *i.e.,* the documents, information, or testimony sought are described with particularity.

**(4)** Whether consultation with the originating component requires that the Chief Counsel make a separate determination as to the disclosure of the information requested.

19 C.F.R. 103.23(a)

13. This is an action that was filed in the U.S. District Court of Florida on the basis of diversity jurisdiction. Florida's substantive law applies and documents requested by Plaintiff are not privileged.

14. Privileges recognized in Florida are: lawyer/client privilege; psychotherapist/patient privilege; sexual assault counselor/victim privilege; domestic violence advocate/victim privilege; husband/wife privilege; clergy/parishioner privilege; and accountant/client privilege. See FL. Stat. §90.501-90.5055.

15. A plain reading of the statute reveals that Defendants are not subject to any privilege thus, disclosure is appropriate.

16. Federal Rules of Civil Procedure govern this proceeding. This matter concerns the death of Krystal Talavera due to the Defendants sale of Kratom, a botanical imported into the U.S. and sold to consumers. Plaintiff seeks disclosure of specific documents that are directly related to the importation of kratom by Defendants. Disclosure is appropriate.

17. A careful review of the summons, complaint, this affidavit, and additional pleadings filed in this action reveals that the information sought is relevant, material, and necessary. Specifically, Plaintiff seeks to name all parties within the chain of distribution, and the documents sought from CBP will potentially identify liable parties.

18. Additionally, Defendant Harder has asserted the Fifth Amendment, opting not to reveal any information that would further this litigation.

19. If Plaintiff is unable to identify the necessary parties to add to this suit within the statute of limitations, Plaintiff will be unfairly prejudiced and left without an adequate legal remedy.

20. The requested materials cannot be obtained through any other means. Through use of the 5th Amendment, Defendants refuse to turnover any information sought, including initial disclosures pursuant to F.R.C.P. 26 and upstream suppliers responsible for Krystal's death.

21. Plaintiff is now forced to seek the necessary information needed to bring justice from third parties like CBP.

22. Plaintiff respectfully requests CBP to take an interest in this production as it involves the unlawful importation of a dangerous substance harming U.S. citizens.

23. Plaintiff's counsel is available for a meet and confer to discuss the matter in further detail.

Dated: March 23, 2023

**Signed and filed under penalty of perjury:**

Tamara J. Williams, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CIVIL DIVISION

DEVIN FILIPPELLI, as
Personal Representative of the
ESTATE OF KRYSTAL TALAVERA,
on behalf of the Estate and her
Survivors,

                Plaintiff,

vs.

GROW, LLC (d/b/a KD INCORPORATED
and THE KRATOM DISTRO); and
SEAN MICHAEL HARDER, individually.

                Defendants.

CASE NO: 9:22cv81731

## AMENDED COMPLAINT FOR WRONGFUL DEATH
## AND DEMAND FOR JURY TRIAL

### I. INTRODUCTION

This is a product liability action against the manufacturers, distributors, and sellers of Kratom, a non-prescription dietary supplement. Plaintiff, DEVIN FILIPPELLI, as Personal Representative of THE ESTATE OF KRYSTAL TALAVERA and on behalf of her Estate and her survivors, sues Defendants, GROW, LLC (d/b/a KD INCORPORATED and THE KRATOM DISTRO); and SEAN MICHAEL HARDER (hereinafter jointly "Defendants"), and alleges as follows:

### II. STATEMENT OF PARTIES

1. The ESTATE OF KRYSTAL TALAVERA (hereinafter "the Estate") has been opened in a probate action by the Circuit Court of Palm Beach County.

1

2.      Krystal Talavera (hereinafter "Krystal") was the mother to four (4) children, all of whom reside in Palm Beach County, Florida.

3.      DEVIN FILIPPELLI (hereinafter "Devin"), the eldest of Krystal's four (4) children, was duly appointed by the Palm Beach County Probate Court as Personal Representative of the Estate. (See Letters of Administration, attached as Exhibit "A").

4.      Devin was and is a resident of the state of Florida. He brings this claim on behalf of the Estate and its beneficiaries, which includes himself and his younger siblings, Krystal's surviving minor children.

5.      Krystal's children include Devin Filippelli, J. C. F. (a minor), B. B. F. (a minor), and D. G. V. (a minor).

6.      Defendant GROW, LLC (d/b/a KD INCORPORATED and THE KRATOM DISTRO) (hereinafter "GROW, LLC") is a foreign corporation existing and doing business pursuant to the laws of the state of Idaho, with its principal place of business in Boise, Idaho. GROW, LLC was and is an Idaho corporation engaged in the marketing, sale, and distribution of Kratom products to consumers nationwide, including consumers in Palm Beach County, Florida. At all times material and relevant, GROW, LLC did and continues to do business in the state of Florida.

7.      Defendant SEAN MICHAEL HARDER (hereinafter "HARDER") is the registered agent, owner, and operator of GROW, LLC. At all times material and relevant, HARDER resided in, and continues to reside in, Meridian, Idaho. HARDER packaged, shipped, and distributed Kratom products to Krystal directly from his

home in Idaho. HARDER directly accepted payment for and has profited from the importation, distribution, marketing, and sale of GROW, LLC's Kratom products.

8.      At all times material and relevant, each Defendant was and is the alter ego of the other.

9.      At all times material and relevant, each Defendant conducted business in the state of Florida and did in fact market, distribute, and supply Kratom products to consumers within the state of Florida, including Krystal Talavera.

### III. JURISDICTION AND VENUE

10.      This action is for damages in excess of seventy-five thousand dollars ($75,000.00), exclusive of interest, costs, attorneys' fees, and declaratory relief. 28 U.S.C. § 1332(a).

11.      The U.S. District Court for the Southern District of Florida has subject matter jurisdiction over this case because it satisfies the requirements of 28 U.S.C § 1332, such that the matter can be heard on the basis of diversity jurisdiction.

12.      Defendant GROW, LLC is a limited liability company with citizenship in Idaho.  Defendant SEAN HARDER is the only member of GROW, LLC.  Defendant SEAN HARDER is domiciled in Meridian, Idaho.  Plaintiff is domiciled in Boynton Beach, Florida.  There is complete diversity of the parties.

13.      Venue is proper in the U.S. District Court for the Southern District of Florida. 28 U.S.C. § 1391.

14.      At all times relevant and material, Plaintiff's injuries and causes of action accrued in Palm Beach County, Florida. Additionally, Palm Beach County,

Florida, is where each Defendant continuously transacts business and continuously committed torts upon which Plaintiff's claims are based.

## IV. STATEMENT OF FACTS

**A.** **Kratom is a deadly drug that is being marketed as a safe dietary supplement in the United States.**

15.     Kratom is an herbal extract derived from the leaves of *Mitragyna speciosa*, a tropical tree native to Southeast Asia.

16.     The nature and extent of Kratom's impact upon human physiology is the topic of ongoing study.

17.     Although not formally classified as an opiate, Kratom contains dozens of psychoactive compounds or alkaloids, many of which are not understood.

18.     The two (2) most-studied alkaloids are mitragynine and 7-hydroxymitragynine. These two alkaloids bind to the same opioid brain receptors as morphine. Like opiates, these compounds can lead to analgesia (release of pain), euphoria, and sedation.

19.     Kratom's serious health risks include abuse, dependence, addiction, overdose, and death.[1] Scientific literature documents serious concerns regarding the toxicity of Kratom in multiple organ systems. Consumption of Kratom can lead to many adverse health impacts, including respiratory depression, nervousness, agitation, aggression, sleeplessness, hallucinations, delusions, tremors, loss of libido,

---

[1] See FDA News Release, FDA issues warnings to companies selling illegal, unapproved kratom drug products (https://www.fda.gov/news-events/press-announcements/fda-issues-warnings-companies-selling-illegal-unapproved-kratom-drug-products-marketed-opioid) (last accessed Nov. 1, 2022); see also DOJ DEA Drug Fact Sheet – Kratom (https://www.dea.gov/sites/default/files/2020-06/Kratom-2020_0.pdf) (last accessed Nov. 1, 2022).

constipation, skin hyperpigmentation, nausea, vomiting, severe withdrawal, seizures, psychosis, and lung damage.

20.     Kratom is not approved for medical purposes, and Kratom is illegal in several states and cities, including: Alabama, Arkansas, Indiana, Rhode Island, Vermont, Wisconsin; San Diego, California; Denver, Colorado; Sarasota County, Florida; Jerseyville, Illinois; and Union County, Mississippi.

21.     Kratom is not FDA approved. The FDA issued numerous warnings against the use of products containing Kratom or its psychoactive compounds and has taken action against those who illegally sell the product for pain treatment and other medical uses.[2]

22.     Kratom is not approved for importation and distribution in interstate commerce without a premarket substantiation that the product containing Kratom is reasonably safe for human consumption. The FDA has issued numerous warnings to companies importing and selling Kratom for human consumption and for medicinal purposes. Federal officials have also pursued enforcement actions against those illegally importing and selling adulterated and misbranded products.

23.     Nonetheless, products containing Kratom are sold online and at numerous retail outlets throughout the country, including gas stations, vape shops, and head shops.

---

[2] See FDA Statement, Statement from FDA Commissioner Scott Gottlieb, M.D. on FDA advisory about deadly risks associated with Kratom (https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-fda-advisory-about-deadly-risks-associated-kratom) (last accessed Nov. 1, 2022).

24.     Companies and individuals that produce and sell Kratom, including GROW, LLC and HARDER, present Kratom as an all-natural supplement which is safe for consumption and legal to sell in the United States.

25.     By sidestepping consumer protections, the Kratom industry has grown dramatically in the United States. This profitable black-market industry has generated enough ill-gotten gains to fund the development of trade organizations like the American Kratom Association (AKA) and has mobilized lobbyists, a network of Kratom advocates, and industry-backed researchers to try and legitimize the ongoing profiteering of those in the Kratom business, despite their ongoing failure and refusal to comply with the clear and mandatory standards for establishing safety and efficacy of new dietary ingredients, supplements, and drugs before they are sold to the public.

26.     With the proliferation of Kratom products, U.S. consumers are paying a heavy price, including a growing number of deaths caused by Kratom.

27.     The deceptive marketing and sale of these products encourages consumers to experiment with mysterious and dangerous compounds in lieu of seeking appropriate and approved medical treatments that can be safely supervised by medical professionals.

28.     In recent years, several Kratom manufacturers, including Defendants, GROW, LLC and HARDER, began importing, producing, and marketing concentrated Kratom, in capsule and powdered form.

29.     Defendants, GROW, LLC and HARDER, misrepresented and misled consumers about the risks of Kratom, and this led to the tragic death of Krystal

Talavera. (See Kratom Distro, Kratom Strain Information guide attached hereto as Exhibit "B").

**B.**    **Krystal Talavera suffered a preventable and untimely death caused by Kratom.**

30.    This case is about the unnecessary death of Krystal Talavera; a death that could have and should have been prevented.

31.    On June 20, 2021, thirty-nine (39) year old Krystal Talavera resided in Palm Beach County, Florida, with her partner and children.

32.    Just one day prior to her death, on June 19, 2021, Krystal celebrated the high school graduation of her eldest son, Devin Filippelli, who was preparing to attend the University of Florida, to pursue a bachelor's degree in computer science.

33.    Krystal was a loving mother for whom family meant everything.

34.    Krystal also enjoyed a successful career as a registered nurse at Trustbridge Hospice Care in West Palm Beach, Florida, where she had recently been promoted to manager just prior to her death.

35.    In the years preceding Krystal's death, she was introduced to Kratom by friends. Krystal was under the belief that Kratom was, as it is marketed, a safe and natural dietary supplement.

36.    Krystal regularly purchased Kratom online from Defendants, GROW, LLC and HARDER, who market Kratom using the name, THE KRATOM DISTRO, and sell various name brands which include "Space Dust," "Green Maeng Da" (a/k/a "G2"), "Green Horned Maeng Da" (a/k/a "G4"), and "Green Riau" (a/k/a "G5"). All four

(4) brands were packaged in Idaho by Defendants, GROW, LLC and HARDER, and shipped to Krystal's home in Boynton Beach, Florida.

37.     Krystal regularly purchased and consumed "Space Dust," "Green Maeng Da," "Green Horned Maeng Da," and "Green Riau" Kratom from Defendants, GROW, LLC and HARDER, under the belief that Kratom was a safe dietary supplement with several health benefits.

38.     On the morning of June 20, 2021, Krystal was home preparing Father's Day breakfast for Biagio Vultaggio, her partner and father of her youngest child, D.G.V.

39.     Around 1100 hours, Mr. Vultaggio woke up, walked out of his bedroom, and found Krystal lying face down on the living room floor.

40.     Mr. Vultaggio turned Krystal over, and immediately realized that something was wrong.

41.     Krystal's minor child, D.G.V., was present nearby, and witnessed his mother lying on the floor unconscious.

42.     Next to Krystal, Mr. Vultaggio found a cup of hot coffee and an open bag of "Space Dust" that Krystal purchased from Defendants, GROW, LLC and HARDER.

43.     Mr. Vultaggio called the paramedics and, shortly thereafter, the paramedics arrived and transported Krystal to Bethesda Hospital East in Boynton Beach, Florida.

44.     At the hospital, medical personnel pronounced Krystal dead.

45.     An autopsy was performed, and the Palm Beach County Coroner determined the cause of death was "acute mitragynine intoxication. At high concentrations, mitragynine produces opioid-like effects, such as respiratory failure."

46.     Plaintiff brings this lawsuit within two (2) years of decedent's date of death.

## V. DAMAGES AND CAUSES OF ACTION

47.     The injuries from the dangerous and defective Kratom products that killed Krystal caused and will continue to cause economic losses to the Estate in the form of medical expenses, funeral expenses, lost wages, and loss of earning capacity, in an amount to be determined by a jury.

48.     Krystal's death caused and continues to cause Plaintiff's beneficiaries and the Estate non-economic damages, including pain and suffering, loss of support and services, and loss of parental companionship, instruction, and guidance, for mental pain and suffering in an amount to be determined by a jury.

49.     Krystal suffered an untimely death as a direct and proximate result of the Kratom products that were manufactured, marketed, distributed, and sold by Defendants, GROW, LLC and HARDER.

50.     The Estate and its beneficiaries have incurred and will continue to incur enormous general and special damages in an amount to be determined by a jury.

51.     Defendants, GROW, LLC and HARDER, are jointly and severally liable for the damages caused to the Estate and its beneficiaries.

## COUNT ONE – GROW, LLC AND SEAN MICHAEL HARDER
## (STRICT LIABILITY FAILURE TO WARN PURSUANT TO THE
## RESTATEMENT SECOND OF TORTS § 402A)

52.     GROW, LLC and HARDER were engaged in the business of promoting, manufacturing, distributing, and selling various Kratom products, including those that caused Krystal's ultimate passing, such as the concentrated "Space Dust" discovered nearby Krystal at the time of her death.

53.     The Kratom products that Krystal purchased and ingested were expected to and did reach Krystal without substantial change in condition at the time they left Defendants' hands.

54.     GROW, LLC's and HARDER's Kratom products were constantly sold without any warning regarding instructions for use, the recommended dosage, and known risks of the products, including the risks of abuse, dependence, addiction, overdose, and death. (Pictures of the Kratom sold to Krystal by Defendants, GROW, LLC and HARDER, are shown on page 22).

55.     An ordinary consumer would reasonably conclude that GROW, LLC's and HARDER's Kratom products are unreasonably unsafe when sold without warnings or instructions about the serious adverse health risks, including the risk of overdose and death suffered by Krystal.

56.     In addition, at the time of manufacture, the likelihood that GROW, LLC's and HARDER's Kratom products would cause the serious harms inflicted on Krystal rendered GROW, LLC's and HARDER's lack of warnings and instructions completely inadequate.

10

57.     At the time and on the occasion in question, Krystal used GROW, LLC's and HARDER's Kratom products for the very purposes intended and promoted.

58.     Without proper warnings and instructions, the Kratom products were unreasonably dangerous, unfit for their intended use, and highly dangerous and defective.

59.     If the products had been sold with appropriate warnings and instructions regarding health risks, including but not limited to the risks of overdose and death, then Krystal's overdose and death from Kratom would not have occurred.

60.     GROW, LLC and HARDER are strictly liable for all damages caused by their failure to provide adequate warnings and instructions that would have prevented the death caused by their defective and unreasonably dangerous nature of their Kratom products.

61.     GROW, LLC and HARDER are liable for all damages caused by their negligent failure to provide adequate warnings and instructions that would have prevented the death caused by their defective and unreasonably dangerous nature of their Kratom products.

62.     GROW, LLC and HARDER also had a continuing, post-sale duty to warn regarding the unreasonable risk of harm associated with the Kratom products after the Kratom products had been distributed to Krystal.

63.     After Krystal began purchasing and ingesting the Kratom products, GROW, LLC and HARDER received increasing actual and constructive notice about

specific risks and dangers associated with the Kratom products, including the risk of death.

64.     After Krystal began purchasing and ingesting the Kratom products, GROW, LLC and HARDER breached their duty to issue adequate post-sale instructions and warnings to reduce and prevent the foreseeable risk of harm and death to Krystal from GROW, LLC's and HARDER's Kratom products.

65.     GROW, LLC and HARDER failed to exercise reasonable care to provide adequate post-sale instructions and warnings to Krystal and other Florida residents about the serious health risks and dangers of the Kratom products, including the risk and danger of death.

66.     As a direct and proximate result of the lack of reasonable and adequate instructions or warnings regarding the defects in Defendants' Kratom products, particularly "Space Dust," "Green Maeng Da," "Green Horned Maeng Da," and "Green Riau," Krystal Talavera overdosed and died, causing irreparable injury and damages to the ESTATE OF KRYSTAL TALAVERA as described herein.

**COUNT TWO – GROW, LLC AND SEAN MICHAEL HARDER
(STRICT LIABILITY DESIGN AND MANUFACTURING DEFECT
PURSUANT TO THE RESTATEMENT SECOND OF TORTS § 402A)**

67.     At the time GROW, LLC and HARDER manufactured the "Space Dust," "Green Maeng Da," "Green Horned Maeng Da," and "Green Riau" Kratom sold to and consumed by Krystal, the products were not reasonably safe as designed.

68.     Under a Risk-Utility analysis, the likelihood that the Kratom products would cause Krystal harm, and the seriousness of those harms (including death),

outweighed Defendants' burden to design Kratom products that would have prevented those harms and adverse effects.

69.     Under a Consumer Expectation analysis, the Kratom products were more dangerous than the ordinary consumer would reasonably expect, considering the products' intrinsic nature, relative cost, severity of potential harm (including death), lack of warning, recommended dosage, and the cost and feasibility of minimizing such risk.

70.     GROW, LLC's and HARDER's Kratom products that were sold to and consumed by Krystal also contained manufacturing defects. "Space Dust," "Green Maeng Da," "Green Horned Maeng Da," and "Green Riau" manufactured by GROW, LLC and HARDER departed from their intended design in that the products were adulterated and/or did not conform to the safe design and purity standards required and specified by Defendants.

71.     GROW, LLC and HARDER were aware that they were unable to adequately conform the manufacturing process to achieve products that were reasonably safe for human consumption.

72.     The Kratom products, "Space Dust," "Green Maeng Da," "Green Horned Maeng Da," and "Green Riau," sold to Krystal were unreasonably dangerous beyond the expectations of the ordinary consumer and were unfit for their intended use.

73.     At the time and on the occasion in question, Defendants' Kratom products, "Space Dust," "Green Maeng Da," "Green Horned Maeng Da," and "Green

Riau," were being used by Krystal for the purpose for which they were marketed and intended, and the products were defective, unsafe, and unreasonably dangerous.

74.     As a direct and proximate result of the defects in Defendants' Kratom products, Krystal Talavera overdosed and died, causing irreparable injury and damages to the ESTATE OF KRYSTAL TALAVERA as described herein.

**COUNT THREE – GROW, LLC AND SEAN MICHAEL HARDER
(BREACH OF WARRANTY PURSUANT TO FLA. STATE. §§ 672.313; 672.314;
& 672.315.)**

75.     Defendants, GROW, LLC and HARDER, expressly and impliedly warranted that their Kratom products were reasonably fit for their intended purposes of improving health and well-being and as safe dietary supplements.

76.     GROW, LLC and HARDER warranted, without limitation, that their Kratom products were completely safe and natural.

77.     GROW, LLC and HARDER also warranted that their Kratom products conformed with the express representations contained in Exhibit B.

78.     GROW, LLC and HARDER issued these warranties to develop and promote the sale of their Kratom products through their distribution chain, including the sales to Krystal.

79.     Defendants GROW, LLC and HARDER's warranties related to material facts regarding the safety and efficacy of their Kratom products.

80.     Defendants GROW, LLC and HARDER's warranties were part of the basis of the bargain for Krystal's purchase of their Kratom products.

81.     Defendants GROW, LLC and HARDER's warranties were untrue. Their Kratom products did not conform to the representations that were made.

82.     Defendants, GROW, LLC and HARDER, were at all times relevant hereto in privity with Krystal Talavera.

83.     As a direct and proximate result of the breach of Defendants' warranties of "Space Dust," "Green Maeng Da," "Green Horned Maeng Da," and "Green Riau" Kratom products, Krystal Talavera overdosed and died, causing irreparable injury and damages to the ESTATE OF KRYSTAL TALAVERA as described herein.

### COUNT FOUR – GROW, LLC AND SEAN MICHAEL HARDER (FRAUDULENT MISREPRESENTATION)

84.     Defendants, GROW, LLC and HARDER, made misrepresentations of material facts about their Kratom products and intentionally concealed information about the products from Krystal during the time she bought and used the products.

85.     Defendants, GROW, LLC and HARDER, refer to their Kratom products as very effective pain relievers, energy boosters, and a sense of euphoria. (Refer to Exhibit "B" for the complete list of Kratom Strain information).

86.     Defendants, GROW, LLC and HARDER, failed in their duty to disclose known material facts to Plaintiff regarding "Space Dust," Green Maeng Da," "Green Horned Maeng Da," and "Green Riau" Kratom products, including but not limited to:

a. The health risks associated with regular consumption of Kratom products.

b. Information regarding adverse events associated with Kratom products.

c. The risk of addiction, overdose, and death associated with Kratom products.

15

87. Additional misrepresentations and concealment included, but were not limited to:

a. Failing to disclose that Kratom products will cause death.

b. Falsely representing that Kratom products are completely safe and natural.

c. Falsely representing that their Kratom products are lab tested for quality and purity.

88. The above representations and omissions made by Defendants, GROW, LLC and HARDER, were material and were made with the intent to persuade and induce Krystal to regularly consume their Kratom products.

89. Defendants, GROW, LLC and HARDER, made the above representations or omissions knowing them to be false misrepresentations, or Defendants were ignorant of the truth of the assertions.

90. The above representations and omissions are reflected in GROW, LLC's and HARDER's system for marketing their products. Together, Defendants, GROW, LLC and HARDER, unlawfully promoted and sold the unreasonably dangerous Kratom products to Florida residents, including Krystal Talavera.

91. Defendants, GROW, LLC and HARDER, made the above misrepresentations or omissions with the intention and knowledge that consumers would select the Kratom products for regular consumption for the purposes identified in their marketing.

92.     Krystal relied upon and was induced to act in reliance on Defendants GROW, LLC and HARDER's misrepresentations and omissions when she in fact purchased the Kratom products under the assumption that the products were safe and completely natural dietary supplements.

93.     As a direct and proximate result of the breach of the warranty regarding the Kratom products, Krystal Talavera overdosed and died, causing irreparable injury and damages to the ESTATE OF KRYSTAL TALAVERA as described herein.

### COUNT FIVE – GROW, LLC AND SEAN MICHAEL HARDER (NEGLIGENCE)

94.     As manufacturers, distributors, and sellers of Kratom, GROW, LLC and HARDER had a duty to reasonably investigate and inspect these Kratom products before selling them, to ensure they were safe for human consumption. Defendants also had a duty to ensure that their Kratom products being sold were not adulterated or misbranded, and a duty to ensure their Kratom products did not contain false representations of material facts.

95.     When Defendants, GROW, LLC and HARDER, sold their Kratom products to Krystal, Defendants knew or should have known that their Kratom products were not FDA approved and were unreasonably dangerous for human consumption. Knowledge of Kratom's dangers was readily available from news articles, news segments, medical literature, FDA, and the American Kratom Association.

96.     Defendants, GROW, LLC and HARDER, packaged and shipped Kratom products to consumers, including Krystal Talavera, directly from HARDER's residence in Meridian, Idaho.

97.     Defendants, GROW, LLC and HARDER, knew or should have known that the Kratom products packaged, shipped, and sold from HARDER's home in Meridian, Idaho, were adulterated, misbranded, lacked warning labels, dosage instructions, and carried serious risks of injury and death to consumers, including Krystal Talavera.

98.     Defendants, GROW, LLC and HARDER, breached their duties of care in selling Kratom products in one or more of the following ways:

a.  Defendants knew of or should have known of Kratom's potential to cause serious side effects, including tolerance, addiction, overdose, and death.

b.  Defendants knew or should have known that they were unlawfully selling Kratom products to customers even though the unreasonable health risks of such use were not properly understood, identified, disclosed, approved, or regulated.

c.  Defendants knew or should have known that their disclaimers were a sham attempt to avoid responsibility for Kratom products that were not safe for human consumption.

d.  Defendants negligently passed on to consumers, including Krystal Talavera, representations about the Kratom products, including

18

representations that the Kratom was safe, pure, and appropriate for pain relief.

99.    GROW, LLC's and HARDER's negligence was a substantial contributing factor and proximate cause of Krystal's death, warranting an award for damages to Plaintiff, the ESTATE OF KRYSTAL TALAVERA.

**COUNT SIX – GROW, LLC AND SEAN MICHAEL HARDER
(NEGLIGENCE PER SE PURSUANT TO VIOLATIONS OF THE FOOD, DRUG, AND COSMETICS ACT AND DIETARY SUPPLEMENT HEALTH AND EDUCATION ACT)**

100.    Defendants, GROW, LLC and HARDER, market, sell, and distribute dietary supplements containing *mitragyna speciosa* (a/k/a Kratom), in powder, liquid, and capsule form.

101.    As a plant, Kratom is botanical and, therefore, a dietary ingredient within the meaning of 21 U.S.C. § 321(ff)(1)(C).

102.    Kratom was not marketed as a dietary ingredient in the United States prior to October 15, 1994; therefore, it is a new dietary ingredient within the meaning of 21 U.S.C. § 350b(d).

103.    The Federal Food, Drug, and Cosmetic Act ("FDCA") and the Dietary Supplement Health and Education Act (DSHEA) require manufacturers and distributors who wish to market dietary supplements that contain "new dietary ingredients" to prepare and submit a Premarket Notification to the FDA about these ingredients.[3]

---

[3] See New Dietary Ingredients (NDI) Notification Process (https://www.fda.gov/food/dietary-supplements/new-dietary-ingredients-ndi-notification-process accessed Nov. 1, 2022).

104.    Products containing Kratom are deemed adulterated unless the manufacturer or distributor has complied with the mandate of 21 U.S.C. § 350b(a)(2).

105.    This mandate requires (1) a premarket substantiation that the Kratom product is reasonably expected to be safe; and (2) a premarket NDI Notification that properly documents the evidence that the Kratom product is reasonably expected to be safe.

106.    Furthermore, pursuant to 21 U.S.C. § 331, the following are prohibited acts under the FDCA:

a.      The introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded.

b.      The adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce.

c.      The receipt in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise....

d.      The manufacture within any Territory of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded.

21 U.S.C. § 331.

107.    According to the FDCA, a food shall be deemed misbranded if "(1) its labeling is false or misleading in any particular, or (2)…its advertising is false or

misleading in a material respect or is in violation of Section 350(b)(2) [4] of this title." 21 U.S.C. § 343(a).

108.   A food is deemed misbranded if in package form unless it bears a label containing "(1) the name and place of business of the manufacturer, packer, or distributor; and (2) an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count." 21 U.S.C. § 343(e).

109.   Defendants, GROW, LLC and HARDER, violated all above-referenced statutes by failing to notify the FDA of Kratom's ingredients before marketing and placing Kratom products into interstate commerce, by failing to undergo premarket substantiation to establish that Kratom is reasonably expected to be safe, and mislabeling and misbranding their Kratom products.

110.   The Kratom products delivered to Krystal Talavera from Defendants, GROW, LLC and HARDER, display the names, "Space Dust," "G2," "G4,"and "G5," handwritten with a permanent marker as depicted below.

---

[4] 21 U.S.C. § 350(b)(2): The labeling for any food to which this section applies may not list its ingredients which are not dietary supplement ingredients described in section 321(ff) of this title (i) except as a part of a list of all the ingredients of such food, and (ii) unless such ingredients are listed in accordance with applicable regulations under section 343 of this title. To the extent that compliance with clause (i) of this subparagraph is impracticable or results in deception or unfair competition, exemptions shall be established by regulations promulgated by the Secretary.



111.    Moreover, GROW, LLC and HARDER advertise their strains of Kratom to: treat pains and other discomforts; have a euphoric effect; and provide relaxation and energy.[5]

112.    The statutory standards mentioned above are designed to protect consumers like Krystal Talavera from the very harms she ultimately suffered, including adverse health impacts, toxicity, and death from an unsafe product.

113.    Krystal Talavera is a member of the class that the statute is intended to protect: consumers of dietary supplements in the marketplace.

114.    Defendants GROW, LLC and HARDER's violations of these federal statutory standards constitute negligence per se, warranting an award of damages against all Defendants.

**CLAIMS FOR DAMAGES COMMON TO ALL COUNTS**
**CLAIM OF PERSONAL REPRESENTATIVE ON BEHALF OF THE**
**ESTATE AND SURVIVORS**

115.    As a direct and proximate result of the negligence and misrepresentations of Defendants which caused the untimely death of Krystal Talavera, the personal representative of her estate sets forth the forgoing claims for the decedent's estate and the decedent's surviving children pursuant to Florida Statutes § 768.21 and § 46.021.

---

[5]See Kratom Strain Information advertised, marketed, and promoted by Defendants, GROW and HARDER at: (https://www.kratomdistro.com/strains/) (last accessed Nov. 1, 2022) and attached hereto as Exhibit B.

## CLAIM OF PERSONAL REPRESENTATIVE ON BEHALF OF THE ESTATE OF KRYSTAL TALAVERA

116.     The ESTATE OF KRYSTAL TALAVERA has in the past suffered and will in the future continue to suffer the following damages:

a.     Loss of earnings of Krystal Talavera from the date of death, including loss of support and services and including contributions in kind with interest;

b.     Medical or funeral expenses, or both, that have been incurred due to the death of Krystal Talavera, which have become a charge against her estate and were paid by or on behalf of the decedent.

## CLAIM OF PERSONAL REPRESENTATIVE ON BEHALF OF SURVIVING CHILDREN

117.     Devin Filippelli, J. C. F. (a minor), B. B. F. (a minor), and D. G. V. (a minor), as the surviving children of Krystal Talavera, have in the past suffered, and will in the future continue to suffer, the following damages:

a.     Loss of future support and services from the date of Krystal Talavera's death, with interest;

b.     Loss of parental companionship, instruction, guidance, and for mental pain and suffering from the date of death.

## VI. PRAYER FOR RELIEF AND DEMAND FOR JURY TRIAL

**WHEREFORE**, the ESTATE OF KRYSTAL TALAVERA, by and through Krystal's eldest son, DEVIN FILIPPELLI, and on behalf of all its beneficiaries, respectfully requests:

(a) A jury be impaneled to hear this case;

24

(b) Judgment against Defendants, GROW, LLC and SEAN MICHAEL HARDER, for wrongful death, general and special damages in an amount to be proven at trial;

(c) Reasonable attorney's fees and costs; and

(d) Such other relief as the Court deems just and proper under the circumstances of this case.


Dated: November 11, 2022

Respectfully submitted,

_____
Michael J. Cowgill, Esq.
Florida Bar No. 1010945
Tamara J. Williams, Esq.
Florida Bar No. 127625
mctlaw
1605 Main Street, Suite 710
Sarasota, FL 34236
Telephone: 888.952.5242
Facsimile: 941.952.5042
Primary: mcowgill@mctlaw.com
Primary: twilliams@mctlaw.com
Secondary: hdiener@mctlaw.com
Secondary: mpowell@mctlaw.com

*Attorneys for Plaintiff*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

DEVIN FILIPPELLI, as Personal Representative
of the ESTATE OF KRYSTAL TALAVERA,
on behalf of the Estate and her Survivors

_____
*Plaintiff(s)*

v.

GROW, LLC (d/b/a KD INCORPORATED
and THE KRATOM DISTRO); and
SEAN MICHAEL HARDER, individually

_____
*Defendant(s)*

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.   9:22cv81731

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Sean Michael Harder, Registered Agent
GROW, LLC (d/b/a KD Incorporated and The Kratom Distro)
1061 N. Cliff Creek Ave.
Meridian, ID 83642

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Michael J. Cowgill, Esq. (mcowgill@mctlaw.com)
Tamara J. Williams, Esq. (twilliams@mctlaw.com)
mctlaw
1605 Main Street, Suite 710
Sarasota, FL 34236
Telephone: 888.952.5242

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



**SUMMONS**

Date:   Nov 7, 2022
_____

Angela E. Noble
Clerk of Court

*s/ Nadhege Augustin*
_____
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

DEVIN FILIPPELLI, as Personal Representative
of the ESTATE OF KRYSTAL TALAVERA,
on behalf of the Estate and her Survivors

_____
*Plaintiff(s)*

v.

GROW, LLC (d/b/a KD INCORPORATED
and THE KRATOM DISTRO); and
SEAN MICHAEL HARDER, individually

_____
*Defendant(s)*

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.   9:22cv81731

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

SEAN MICHAEL HARDER, individually
1061 N. Cliff Creek Ave.
Meridian, ID 83642

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Michael J. Cowgill, Esq. (mcowgill@ mctlaw.com)
Tamara J. Williams, Esq. (twilliams@ mctlaw.com)
mctlaw
1605 Main Street, Suite 710
Sarasota, FL 34236
Telephone: 888.952.5242

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



**SUMMONS**

Date:   Nov 7, 2022
_____

*s/ Nadhege Augustin*
_____
Deputy Clerk
U.S. District Courts

Angela E. Noble
Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CIVIL DIVISION

DEVIN FILIPPELLI, as
Personal Representative of the
ESTATE OF KRYSTAL TALAVERA,                    CASE NO: 9:22-cv-81731
on behalf of the Estate and her
Survivors,

               Plaintiff,

vs.

GROW, LLC (d/b/a KD INCORPORATED
and THE KRATOM DISTRO); and
SEAN MICHAEL HARDER, individually.

               Defendants.

## **AFFIDAVIT OF TAMARA J. WILLIAMS, ESQ.**

    I, Tamara J. Williams, Esq., state the following in support of Plaintiff's motion to

compel subpoena documents from U.S. Customs and Border Protection ("CBP"):

1. I was admitted to practice law in the State of Florida April 2017, and
   my Florida Bar number is: 0127625.

2. I am in good standing with the Florida Bar Association.

3. I am in good standing and admitted to practice law in the Southern District of
   Florida.

4. I am one of the attorneys who represent the Plaintiff in the above-captioned
   case.

## **Exhibit G**

5. On April 3, 2023, Plaintiff's counsel had a conference call with attorney Karen Makkreel, Assistant Chief Counsel of U.S. Customs and Border Protection ("CBP"), regarding the subpoena served on CBP by Plaintiff on March 10, 2023.

6. Plaintiff's counsel and Ms. Makkreel discussed CBP's objection to the served subpoena and Plaintiff's response to CBP's objection.

7. Ms. Makkreel explained that, while CBP understands why Plaintiff has requested the documents identified in the subpoena, CBP is not in a position to provide the documents requested absent an order from the court.

8. CBP further explained that once a court order is received, CBP will provide the documents Plaintiff seeks pursuant to the March 10, 2023 subpoena.

Dated: April 17, 2023

**Signed and filed under penalty of perjury:**

_____
Tamara J. Williams, Esq.